## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

ANDREW J. KAMPURIES,

     Plaintiff,

  v.            1:25-CV-341
                 (LEK/MJK)

NEW YORK STATE LOCAL RETIREMENT SYSTEMS, *et. al.*

     Defendant.

---

ANDREW J. KAMPURIES, Plaintiff, *pro se*

MITCHELL J. KATZ, United States Magistrate Judge

TO THE HONORABLE LAWRENCE E. KHAN, Senior United States District Court Judge:

## ORDER and REPORT-RECOMMENDATION

Plaintiff commenced this action on March 14, 2025, by filing a complaint. (Dkt. 1). And on the same day, Plaintiff moved for leave to proceed *in forma pauperis*. (Dkt. 2). The Clerk has sent the Complaint to the Court for its review.

## I. FACTS

Plaintiff, Andrew Kampuries, and Decedent, Lillian Kampuries, were married in September 1994 and divorced before her death.[1] (Complaint, Dkt. 1-1 at 8; Certificate of Marriage, Dkt. 1-2, at 5). The couple gave birth to two children:

---

[1] Plaintiff's complaint does not explain when the couple divorced. It states, "Plaintiff Andrew J. Kampuries and Liliana LaRosa Kampuries were legally married on [date] and divorced on [date]." (Complaint, Dkt. 1-1 at 8) (brackets in original).

Andrew O. Kampuries, their son, and Grace Kampuries, their daughter.[2]
(Complaint, Dkt. 1-1. at 2).

While alive, Decedent worked at the Port Authority of New York and New Jersey with Defendant Chris Rhoads.[3] *Id.* at 7-8. Ms. Kampuries, through her employment, was enrolled in the New York State Local Retirement Systems Pension Program (NYSLRS). *Id.* At some time before her death, Decedent named her daughter as the beneficiary to her pension entitlement and Plaintiff claims that Ms. Kampuries named him her estate's administrator. *Id.* at 7. But in his letter to the V.C.F., Plaintiff acknowledges that "the grandmother has the letter of administration" (Plaintiff Ltr. to V.C.F. at 23).

Ms. Kampuries, as part of her employment, participated in the cleanup and recovery efforts at Ground Zero following the September 11, 2001 terrorist attacks on the Twin Towers. *Id.* at 4. Decedent's work at ground zero exposed her to "highly toxic, hazardous, and carcinogenic substances." *Id*. at 4. Consistent exposures to these harmful substances led doctors at Memorial Kettering Sloan to diagnosis Decedent with recurrent glioblastoma multiforme. (*Id*. at 4; Decedent's medical records, Dkt. 1-2, at 11). Ms. Kampuries died on May 5, 2005.

---

[2] Plaintiff alleges that Grace is a minor and uses the child's initials in his filings. (Complaint, Dkt. 1-1, at 2). But the Court is confused by this. Even if the child was born on the day the decedent died, she would still be over 18 years old at the time of this lawsuit's filing. And indeed, in his letter to the V.C.F., Plaintiff states that Grace is 24 years old in 2024.
[3] Decedent and Defendant Rhoads became romantically involved at sometime before her passing. (Obituary, Dkt. 1-2, at 24).

Sometime after her death, NYSLRS sought to pay out Decedent's post-retirement-death benefits. *See* (NYSLRS Ltr. to Plaintiff, Dkt. 1-1, at 1). So, Plaintiff accepted NYSLRS's payment of Decedent's benefits on behalf of Grace Kampuries, the beneficiary of Decedent's benefits, who was a minor at the time. *Id*. In 2018, Plaintiff received three payments from the NYSLRS: one payment of $7,361; another payment of $16,041; and a final payment of $16,789. (2018 IRS forms, Dkt. 1-2, at 18).

## II.    <u>PROCEDURAL HISTORY</u>

Plaintiff now sues NYSLRS and Defendant Rhoads, alleging three separate claims. First, Plaintiff alleges that NYSLRS violated his procedural due process right by failing to provide a notice of change in pension benefits. (Complaint, Dkt. 1-1. At 12). Second, Plaintiff alleges that Defendant Rhoads made a fraudulent misrepresentation to Ms. Kampuries causing her to "divert the pensions and deferred compensation benefits of" the decedent to himself "for his personal financial gain" *Id.* at 13. And last, Plaintiff alleges that NYSLRS breached their fiduciary duty to Grace. *Id.* at 14-16.

Plaintiff requests a declaratory judgment, compensatory and punitive damages, and injunctive relief. *Id.* at 16-18.

Turning to merits, the Court will address Plaintiff's IFP status and his complaint under 28 U.S.C. § 1915.

## III.    LEGAL STANDARD

Plaintiff declares in his IFP application that he is unable to pay the filing fee. (Dkt. 2). After reviewing his application, this Court finds that Plaintiff is financially eligible for IFP status.

In addition to determining whether a plaintiff meets the financial criteria to proceed IFP, courts must also consider the sufficiency of the allegations set forth in the complaint. *See* 28 U.S.C. § 1915 (e)(2)(B)(i)-(iii). Courts shall dismiss a case, at any time, if they determine that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. *Id.*

When determining whether an action is frivolous, courts must consider whether the complaint lacks an arguable basis in law or in fact. *See Neitzke v. Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and 28 U.S.C. § 1915. Dismissal of frivolous actions is appropriate to prevent abuses of court process and discourage the waste of judicial resources.  *See Neitzke*, 490 U.S. at 327; *see also Harkins v. Eldredge*, 505 F.2d 802, 804 (8th Cir. 1974). Courts have a duty to show liberality toward *pro se* litigants and must use extreme caution when ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and has had an opportunity to respond. *See Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221

4

F.3d 362, 363 (2d Cir. 2000). But courts must still determine that a claim is not frivolous before permitting a plaintiff to proceed. *See Id.* (finding that a district court may dismiss a frivolous complaint *sua sponte* even when the plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555).

Additionally, Fed. R. Civ. P. 8(a)(2) requires pleadings to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 does not require detailed factual allegations, it does "demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Houston v. Collerman*, No. 9:16-CV-1009 (BKS/ATB), 2016 WL 6267968 at *2 (N.D.N.Y. Oct. 26, 2016) (quoting *Ashcroft*, 556 U.S. at 678). A pleading that contains allegations that "'are so vague as to fail to give the defendants adequate notice of the claims against them' is subject to dismissal." *Id.* (citing *Sheehy v. Brown*, 335 Fed. App'x 102, 104 (2d Cir. 2009)).

## IV.    <u>DISCUSSION</u>

Plaintiff cannot establish a claim against these Defendants for two reasons. First, all the claims Plaintiff seeks to bring are time barred by the statute of limitations. And second, the documents submitted by Plaintiff establish that Decedent's post-retirement-death benefits have already been paid to him. He cannot now sue the agency (and his deceased-ex-wife's lover) alleging that he has not been paid. As a result, this Court recommends that the entire lawsuit be dismissed with prejudice and without leave to amend.[4]

### A. Statute of Limitations

Plaintiff's §1983, fraudulent misrepresentation, and breach of fiduciary duty claims are time barred. Plaintiff needed to bring these claims three years, two years, and three years after their accrual dates, respectively. Yet, he did not. As a result, this Court recommends finding Plaintiff's claims time barred.

"The statute of limitations for § 1983 claim is three years." *King v. New York City Emps. Ret. Sys.*, 212 F. Supp. 3d 371, 397 (E.D.N.Y. 2016) (citation omitted). "Federal claims accrue when the plaintiff knows or has reason to know of

---

[4] Plaintiff also does not have standing. His complaint does not plead that he suffered an injury in fact. Plaintiff's complaint never says that he was supposed to receive any money himself from NYSLRS. *See generally* (Complaint, Dkt. 1-1). In fact, he was only supposed to receive money on behalf of Grace when she was a minor. But since Plaintiff is suing in his personal capacity, he cannot show he suffered an "invasion of a legally protected interest" nor can he show the harm was "concrete and particularized." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

the injury" which form the basis of the action. *Teichmann v. New York City Employees' Ret. Sys.*, No. 21 CIV. 5082 (LGS), 2022 WL 4237110 *6 (S.D.N.Y. 2022).

Here, Plaintiff's § 1983 claim began to accrue when he accepted payment of the benefits on behalf of Grace. *See Id.* ("A procedural due process violation is not complete unless and until the State fails to provide due process") (citations omitted). At that time, Plaintiff would have been on notice that he was not being afforded the process that was due. As a result, he would have needed to bring this suit. While the complaint is unclear when Plaintiff signed for the benefits, he received the payment sometime in 2018. *See* (2018 IRS forms, Dkt. 1-1, at 18). So, with the most generous reading of when he received the money— Plaintiff's claim began to accrue on December 31, 2018.

The statute of limitations here must account for the COVID-19 pandemic. "In general, federal courts 'apply the New York rule for tolling . . . statute of limitations.'" *Miehle-Kellogg v. Cnty. of Suffolk*, No. 19-CV-04943 (GRB/JMW), 2024 WL 5120017 at *10 (E.D.N.Y. Dec. 16, 2024) citing *Bd. of Regents of the Univ. of the State of N.Y. v. Tomanio*, 446 U.S. 478, 483 (1980); *Pearl v. City of Long Beach*, 296 F.3d 76, 81 (2d Cir. 2002). But courts should not "apply the state tolling rule if it would 'defeat the goals of Section 1983." *Miehle-Kellogg*, 2024 WL 5120017 at *10 (citations omitted). On March 7, 2020, Governor Andrew

Cuomo issued Executive Order 202.8 which tolled court operations until April 19, 2020. *Id.* Governor Cuomo extended E.O. 202.8 nine subsequent times, with the last extension ending on November 3, 2020. *Id.* Altogether, the E.O. 202.8 limited court operations for 228 days. *Id.* Courts throughout the Second Circuit have concluded that E.O. 202.8 applies to § 1983 cases. *See Id.* (collecting cases). As a result, Plaintiff had 228 extra days to file his claim.

Plaintiff's § 1983 claim is time-barred by the statute of limitations. Ordinarily Plaintiff's claim would have been time barred on December 31, 2021— three years after the December 31, 2018 accrual date. *See Kings*, *supra*. But E.O. 202.8 extended the statute of limitations by 228 days. So, Plaintiff had until August 16, 2022, to file his claim. Yet he brought this action on March 14, 2025. That is almost three years too late. So, Plaintiff's § 1983 claim is time barred.

Likewise, Plaintiff's fraudulent misrepresentation claim is time barred by the statute of limitations. "Under New York law, an action based upon fraud must be commenced within six years of the date the cause of action accrued, or within two years of the time the plaintiff discovered or could have discovered the fraud with reasonable diligence, whichever is greater." *Matana v. Merkin*, 957 F. Supp. 2d 473, 486 (S.D.N.Y. 2013). Here, whatever fraudulent misrepresentations Rhoads made ended on May 5, 2005, when Lillian died. So, assuming, without deciding, Plaintiff discovered the fraud when he accepted the payments on behalf of his

daughter, Plaintiff's claim is too late. Again, reading the IRS forms as generous as possible, Plaintiff should have become aware of the fraud on December 31, 2018. So, ordinarily, his claim would have been time barred by December 31, 2020. But accounting for E.O. 202.8's 228-day extension, Plaintiff needed to bring this lawsuit by August 16, 2021. But he did not. As a result, Plaintiff's fraudulent misrepresentation claim is time barred.

Finally, Plaintiff's breach of fiduciary duty claim is time barred. "New York's statute of limitations for breach of fiduciary duty is six years when a plaintiff seeks equitable relief and three years when a plaintiff seeks only money damages." *Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 262 (S.D.N.Y. 2008) citing C.P.L.R. §§ 213(1), 214(4); *Cooper v. Parsky*, 140 F.3d 433, 440–41 (2d Cir.1998) (citing N.Y. cases). Here, Plaintiff's daughter, the beneficiary of the benefits, was born in 2000. So, any claim of breach of fiduciary duty began to accrue once Grace reached the age of majority, eighteen. *See* N.Y. C.P.L.R. 105(j) ("The word 'infant', as used in this chapter, means a person who has not attained the age of eighteen years."). This would have been in 2018. And assuming Grace's birthday is October 31, 2000, any breach of fiduciary duty began accruing on October 31, 2018, and normally, would become time barred after October 31,

2020.[5]  But accounting for E.O. 202.8's 228-day-tolling extension, Plaintiff needed to bring the breach of fiduciary duty claim seeking monetary damages by June 16, 2021. *See Kermanshah*, *supra*.  Thus, Plaintiff's breach of fiduciary claim is time barred.

* * *

Taken together, this Court recommends a finding that all of Plaintiff's claims are time barred.

## B. Payment

Plaintiff has already been paid. As stated above, the documents submitted by Plaintiff establish that Decedent's post-retirement-death benefits have already been paid to him. He cannot now sue the agency (and his deceased-ex-wife's lover) that has already paid him alleging that he has not been paid. As a result, this Court recommends a finding that Plaintiff's lawsuit, on the merits, is frivolous because he has already been paid.

Plaintiff has already been paid the money he claims he is owed. To start, NYSLRS "records indicate that" plaintiff *already* "accepted payment of the benefit as the legal guardian of Grace." (NYSLRS Ltr. to Plaintiff, Dkt. 1-1, at 1). Indeed,

---

[5]  Plaintiff does not identify Grace's birthday in his papers. *See generally* (Complaint, Dkt. 1-1). But in his October 31, 2024 letter to the V.C.F. Plaintiff told the special master that Grace is 24. (Plaintiff Ltr. to V.C.F., Dkt. 1-2, at 23). So, this is the latest possible day that she could have turned 24. *See id.*

10

the IRS tax forms that Plaintiff submitted, shows that he received payment from the NYC Retirement System Pension Trust. (2018 IRS forms, Dkt. 1-1, at 18). On that 2018 form, there were three payments made from NYC Retirement System Pension Trust: one payment of $7,361; another payment of $16,041; and a final payment of $16,789. *Id.* Even more damning to Plaintiff's claim is the Sept. 11 Victim Compensation Fund Appendix A form. That form notes that Plaintiff received payment from the "New York State Retirement Port Authority of New York and New Jersey." (Sept. 11 V.C.F. Appendix A, Dkt. 1-1, at 20). Altogether, the evidence shows that NYSLRS duty to pay the designated benefits to Grace Kampuries was completed. *See Landers v. State*, 43 N.Y.2d 784, 785 (1977) (affirming summary judgement where it was undisputed the total of the agreement was paid "in full satisfaction of the terms"); *see also Edwards v. Nemet Motors, LLC*, 60 Misc. 3d 28, 30 (N.Y. App. Term. 2018) (acknowledging that "acceptance of a check in full settlement of disputed claim may operated as an accord and satisfaction discharging the claim"). As a result, Plaintiff's acceptance of "a check in full settlement" of the benefits, "operates as an accord and satisfaction discharging the claim." *One Stop 34, LLC v. Stimdel Props. (FL), Inc.*, No. 19-CV-4011, 2021 WL 8344133, at *13 (E.D.N.Y. Sept. 4, 2021).

Likewise, Plaintiff cannot recover damages from Rhoads. Logically, if Plaintiff has been paid money from NYSLRS then Rhoads could not have made

statements that ultimately injured Plaintiff. *See Hempchain Farms*, LLC v. Sack, 516 F. Supp. 3d 197, 205 (N.D.N.Y. 2021) (Acknowledging that an element of fraudulent misrepresentation under New York law is injury).

   To the extent that Plaintiff's argument is that the fraudulent statement caused him to get less money than he should have, it must fail for two reasons. First, when a party is alleging fraudulent misrepresentation, they must "allege facts that give rise to a strong inference of fraudulent intent" *Id.* Plaintiffs can do this by "(a) alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Id.* (internal citations omitted). Here, Plaintiff never states *anything* Rhoads said to Decedent that could have caused her to change her beneficiary designation.  Flatly, that is not particular. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (Acknowledging that under rule 9(b), for a fraud action to be proper, "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.") (internal citations omitted). Thus, Plaintiff's complaint does not sufficiently plead fraudulent misrepresentation in a manner that would allow his case to continue. *See e.g. Mandarin Trading Ltd. v. Wildenstein,*

16 N.Y.3d 173, 179-80 (2011) (affirming the dismissal of a fraud claim where the "deficiency" of the pleadings "require leaps of fact and logic").

The second issue with Plaintiff's alternative argument is that it is not rooted in facts. Nothing in the documents submitted by Plaintiff establishes how long he was supposed to receive the benefits for Grace or how much he was supposed to receive on his daughter's behalf. *See generally* (Dkts. 1-1, 1-2). In fact, NYSLRS's letter to Plaintiff says, "there are no further option continuance payments being made to anyone for this Participant's membership." (NYSLRS Ltr., Dkt. 1-2, at 1). In capsule form, Plaintiff's first exhibit can be only understood as he accepted payment on behalf of his daughter and there is no more money for him to receive. Plainly, nothing Plaintiff pled establishes legal injury. And that is fatal to his claim.

\* \* \*

As a result, this Court recommends a finding that Plaintiff's lawsuit, on the merits, is frivolous because he has already been paid.

## V.    **OPPORTUNITY TO AMEND**

Generally, before the court dismisses a *pro se* complaint or any part of the complaint *sua sponte*, the court should afford a plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *See Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Here, Plaintiff cannot, and will not, be able to sufficiently demonstrate legal harm because NYSLRS paid the money which the beneficiary—not Plaintiff—was

owed. Thus, there is no claim here. Accordingly, the Court recommends that Plaintiff's Complaint, as to all parties, be dismissed with prejudice and without leave to amend because any amendment would be futile.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED,** that the complaint be **DISMISSED WITH PREJUDICE** and **WITHOUT LEAVE TO AMEND**, and it is further

**ORDERED**, that Plaintiff's pending IFP Application (Dkt. 2) be **GRANTED**, and it is further

**ORDERED**, that while Plaintiff may file objections to this Order and Report-Recommendation, before Plaintiff submits any amended pleading, he should wait for the District Court to rule on the above Orders and Recommendations, and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Order and Report-Recommendation on plaintiff by regular mail.[6]

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d

---

[6] The Clerk shall also provide plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated:  March 28, 2025

                                      _____

                                      Hon. Mitchell J. Katz

                                      U.S. Magistrate Judge

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

2016 WL 6267968
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Eddie HOUSTON, Plaintiff,

v.

COLLERMAN, et. al., Defendants.

9:16-CV-1009 (BKS/ATB)
|
Signed 10/26/2016

**Attorneys and Law Firms**

EDDIE HOUSTON, 08-A-3122, Mid-State Correctional Facility, P.O. Box 2500, Marcy, New York 13403, Plaintiff, pro se.

**AMENDED DECISION AND ORDER** [1]

BRENDA K. SANNES, United States District Judge

## I. Introduction

**\*1** The Clerk has sent to the Court for review a civil rights action filed by pro se plaintiff Eddie Houston. Dkt. No. 1 ("Compl."). Plaintiff has not paid the statutory filing fee for this action and seeks leave to proceed in forma pauperis. Dkt. No. 2 ("IFP Application").

## II. IFP Application

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, No. 09-CV-1922, 2010 W L 5185047, at \*1 (S.D.N.Y. Oct. 26, 2010). Upon review of plaintiff's IFP Application, the Court finds that plaintiff has demonstrated sufficient economic need and filed the inmate authorization form required in the Northern District of New York. Plaintiff's IFP application (Dkt. No. 2) is granted. [2]

## III. Initial Screening

Having found that plaintiff meets the financial criteria for commencing this action in forma pauperis, and because plaintiff seeks relief from an officer or employee of a governmental entity, the Court must consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. §§ 1915(e) and 1915A. Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed in forma pauperis, "the court shall dismiss the case at any time if the court determines that – ... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [3]

Similarly, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (noting that Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee).

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

**\*2** Additionally, when reviewing a complaint, the Court may also look to the Federal Rules of Civil Procedure. Rule 8 of the Federal Rules of Civil Procedure provides that a pleading which sets forth a claim for relief shall contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Hudson v. Artuz*, No. 95 CIV. 4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998) (quoting *Powell v. Marine Midland Bank*, No. 95-CV-0063 (TJM), 162 F.R.D. 15, 16 (N.D.N.Y. June 23, 1995) (other citations omitted)).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Thus, a pleading that contains only allegations which "are so vague as to fail to give the defendants adequate notice of the claims against them" is subject to dismissal. *Sheehy v. Brown*, 335 Fed.Appx. 102, 104 (2d Cir. 2009).

### IV. Summary of the Complaint [4]

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortgage Corp.*, 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)) (footnote omitted); *see also Myers v. Wollowitz*, No. 6:95-CV-0272 (TJM/RWS), 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (stating that "§ 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights." (citation omitted)). "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted). The Court will construe the allegations in plaintiff's complaint with the utmost leniency. *See*, *e.g.*, *Haines v. Kerner*, 404 U.S. 519, 521 (1972) (holding that a pro se litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers.").

**\*3** Plaintiff, an inmate currently being held at Mid-State Correctional Facility ("Mid-State C.F."), asserts claims arising out of his confinement in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). The incidents that form the foundation for this complaint occurred while plaintiff was confined at Elmira Correctional Facility ("Elmira C.F."). *See* Compl., *generally*. On July 13, 2013, plaintiff filed a grievance claiming that defendants Officer Copestick ("Copestick") and Officer Schieber ("Schieber") harassed him, on more than one occasion, about his medication. *See id.* at 6; *see* Dkt. No. 1-1 at 3-5. On August 5, 2013, after an investigation into the allegations, the Superintendent of Elmira C.F. denied plaintiff's grievance. *See* Dkt. No. 1-1 at 5.

On September 30, 2013, plaintiff was on his way to the masjid to participate in Ramadan when he was stopped by Copestick and Schieber and directed to the wall for a pat-frisk. *See* Compl. at 5. While plaintiff's hands were on the wall, Schieber "violently kicked" his legs from underneath him. *See id.* Schieber "stomped" on plaintiff's ankles while Copestick attempted to choke plaintiff. *See id.* During the assault, the officers yelled racial slurs. *See id.* Defendant Sergeant Collerman ("Collerman") watched the officers beat plaintiff. *See* Compl. at 5. As a result of the attack, plaintiff's eyeglasses were broken, his ankle was swollen, and he could not walk. *See id.* at 5, 9.

At approximately 5:00 p.m., plaintiff received medical treatment for complaints of pain in his right big toe and swelling in his right foot. *See* Dkt. No. 1-1 at 19. Plaintiff received Motrin and was advised to follow with sick call requests, if needed. *See id.* A "use of force/inmate injury" report was compiled. [5] *See id.* At approximately 7:15 p.m., plaintiff, a diabetic, told a medical

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

provider that he had not received his daily "medication." *See id.* The provider ordered various medications to be delivered to plaintiff on a daily basis. *See id.*

On October 1, 2013, plaintiff received a misbehavior report charging him with assault on staff and with refusing a direct order and search. [6] *See* Compl. at 5. On the same day, plaintiff was placed in confinement in the Special Housing Unit ("SHU"). *See* Dkt. No. 1-1 at 19. On October 3, 2013, plaintiff attended a Hearing regarding the misbehavior report. [7] *See* Dkt. No. 1-1 at 10. On November 3, 2013, plaintiff received a copy of the hearing disposition dismissing all charges. *See* Dkt. No. 1-1 at 11; Dkt. No. 1 at 5.

On November 3, 2013, plaintiff was released from the SHU. *See* Compl. at 5. While plaintiff was in the SHU, he was unable to participate in Ramadan, denied religious meals, denied parole, and excluded from mental health programs. *See id.*

Construed liberally, the complaint contains the following claims: (1) Copestick and Schieber violated plaintiff's Eighth Amendment rights with use of excessive force (Fifth, Fifteenth, Twentieth, and Twenty-Second Causes of Action); (2) Collerman failed to protect plaintiff from the assault in violation of plaintiff's Eighth Amendment rights (Fifteenth Cause of Action); (3) defendants were deliberately indifferent to plaintiff's serious medical needs in violation of the Eighth Amendment (Sixth, Seventh, and Fifteenth Causes of Action); (4) Copestick and Schieber retaliated against plaintiff in violation of plaintiff's First Amendment rights (Twenty-First Cause of Action); (5) plaintiff's First Amendment rights to religious freedom were violated (Fourth Cause of Action); (6) plaintiff's Fourteenth Amendment rights to due process and equal protection were violated (First, Second, Third, Sixth, Sixteenth, and Eighteenth Causes of Action); (7) defendants failed to investigate plaintiff's complaints and follow grievance procedures (Tenth and Thirteenth Causes of Action); (8) perjury claims against officers who filed the misbehavior report (Eleventh and Seventeenth Causes of Action); and (9) supervisory claims against DOCCS (Eighth, Ninth, Twelfth, Fourteenth, Nineteenth, Twenty-Third, Twenty-Fourth, Twenty-Fifth, and Twenty Sixth Causes of Action). *See* Compl., *generally.* Plaintiff seeks compensatory damages, injunctive relief, and criminal charges against defendants (Eleventh and Seventeenth Causes of Action). *See* Compl. at 9-13.

## V. Analysis

### A. Eleventh Amendment

**\*4** The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. *Gollomp v. Spitzer,* 568 F.3d 355, 365-66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through 42 U.S.C. § 1983, *see Quern v. Jordan,* 440 U.S. 332, 343-45 (1979), and that New York State has not waived its immunity from suit on the claims asserted in plaintiff's complaint. *See generally Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 38-40 (2d Cir. 1977); *Dawkins v. State of New York,* No. 93-CV-1298 (RSP/GJD), 1996 WL 156764 at \*2 (N.D.N.Y. 1996).

Here, insofar as plaintiff seeks an award of money damages pursuant to Section 1983 against DOCCS, those claims are dismissed as plaintiff seeks relief from a defendant immune from suit under section 1983. *See LeGrand v. Evan,* 702 F.2d 415, 417 (2d Cir. 1983); *see Meehan v. Kenville,* 555 Fed.Appx. 116 (2d Cir. 2014); *see Simmons v. Gowanda Corr. Facility,* No. 13-CV-0647, 2013 WL 3340646, at \*1 (W.D.N.Y. July 1, 2013) ("the New York State Department of Corrections and [the named correctional facility] enjoy the same Eleventh Amendment immunity from suit in federal court as enjoyed by the state itself") (quoting *Posr. v. Court Officer Shield No. 207,* 180 F.3d 409, 411 (2d Cir. 1999)).

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

## B. Eighth Amendment

### 1. Excessive Force Claims

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The Eighth Amendment's prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotations omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)); *see also Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973); *see also Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) ("[t]he Supreme Court has emphasized that the nature of the force applied is the core judicial inquiry in excessive force cases—not whether a certain quantum of injury was sustained."). "Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness." *Wynter v. Ramey*, No. 11-CV-0257 (DNH/DEP), 2013 W L 5465343, at *5 (N.D.N.Y. Sept. 30, 2013) (citations omitted).

Plaintiff has identified the time, location and individuals involved in the alleged assault. Thus, the Court finds that plaintiff's Eighth Amendment excessive force claims against Copestick and Schieber survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Failure To Intervene

**\*5** The failure of corrections officers to employ reasonable measures to protect an inmate from violence by others may rise to the level of an Eighth Amendment violation. *See Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985). Moreover, allegations that an officer failed to intervene and prevent assaults are sufficient to state an Eighth Amendment failure to protect claim. *See Rogers v. Artus*, No. 13-CV-21, 2013 WL 5175570, at *3 (W.D.N.Y. Sept. 11, 2013). To establish liability under a failure to intervene theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration: 1) possessed actual knowledge of the use by another of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001). In order to succeed on a claim of failure to protect, the inmate "must establish both that a substantial risk to his safety actually existed and that the offending [defendant] knew of and consciously disregarded that risk." *See Walsh v. Goord*, No. 07-CV-0246, 2007 WL 1572146, at *9 (W.D.N.Y. May 23, 2007) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1970)). In addition, a failure-to-protect claim requires a showing that prison officials acted with "deliberate indifference" to the inmate's safety. *Morales v. New York State Dep't of Corr.*, 842 F.2d 27, 30 (2d Cir. 1988).

At this early stage of the proceeding, plaintiff has alleged enough to require a response from Collerman to plaintiff's claim that he failed to protect plaintiff from the assault by Copestick and Schieber. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

### 3. Deliberate Indifference to Serious Medical Needs

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

To state an Eighth Amendment claim for medical indifference, a plaintiff must allege that the defendant was deliberately indifferent to a serious medical need. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective component of an Eighth Amendment deliberate indifference medical claim "requires that the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)) (internal quotation marks omitted). Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong*, 143 F. 3d 698, 703 (2d Cir. 1998) (quoting *Hathaway*, 99 F.3d at 553). "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To assert a claim for deliberate indifference, an inmate must allege that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702. The inmate must also demonstrate that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. at 835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle*, 429 U.S. at 105-06.

In this instance, even assuming plaintiff's injuries were sufficiently serious, plaintiff must allege facts to demonstrate that defendants acted with a sufficiently culpable state of mind. *See Hathaway*, 99 F.3d at 553. Plaintiff claims that his medical treatment was inadequate because his ankle was not x-rayed until he was transferred to "his next facility," two months after the alleged incident. *See* Compl. at 10. "When the basis of a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (citing *Chance*, 143 F.3d at 702). "Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, this Court has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years." *Demata v. New York State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999) (internal citations omitted).

 **\*6** Here, the complaint is void of any facts establishing that any defendant deliberately delayed plaintiff's medical treatment. On the day of the alleged attack, plaintiff received medical attention and prescription medication. *See* Dkt. No. 1-1 at 19. Plaintiff was treated on three other occasions in October 2013 for foot pain before undergoing x-rays on November 14, 2013. Dkt. No. 1-1 at 20-21. During those visits, plaintiff received ice packs, Motrin, and refused Ibuprofen. See id. Plaintiff does not allege that his condition deteriorated during that time. *See Rodriguez v. City of New York*, 802 F.Supp. 477, 482 (S.D.N.Y. 2011) (finding that the plaintiff did not establish that his condition worsened as a result of a delay between his request and receipt of medical attention). Plaintiff does not allege that he sought and was refused medical treatment during this two month time period. *See Kee v. Hasty*, No. 01 Civ. 2123, 2004 W L 807071, at \*29 (S.D.N.Y. April 14, 2004) (holding that the plaintiff's Eighth Amendment claims were overly conclusory because the inmate failed to specify the dates on which he was denied proper treatment, the nature of his needs on those dates, and the nature of the treatment that was purportedly denied by the defendants). The complaint lacks any facts to plausibly suggest that any defendant knew of the severity of plaintiff's injury and the risk posed by any delay in his treatment.

Plaintiff, a diabetic, also claims that he was unable to read or see for over one year because his eye glasses were not replaced until over a year after the assault. *See* Compl. at 10. The complaint does not contain any facts suggesting that plaintiff made any complaints or sick call requests to any defendant related to his eyeglasses. Plaintiff also failed to assert facts suggesting that he made any defendant "aware of the serious harm could occur" if he was not provided with his glasses. *See Myrie v. Calvo/Calvoba*, 591 F.Supp.2d 620, 628 (S.D.N.Y. 2008) (holding that the complaint did not suggest that any defendant was deliberately indifferent to the plaintiff's vision problems).

Plaintiff's Eighth Amendment allegations are also subject to dismissal based upon the failure to plead personal involvement on the part of any defendant. It is well settled in this Circuit that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted). The complaint lacks any facts suggesting that Copestick, Schieber, or Collerman were involved in plaintiff's medical treatment or refused to allow plaintiff to receive medical attention. In the absence of factual allegations sufficient to plausibly suggest that any defendant was personally involved, the complaint fails to state a cognizable claim against him. Consequently, plaintiff's Eighth Amendment claims for deliberate indifference to plaintiff's medical needs are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim.

### C. First Amendment

#### 1. Retaliation

Plaintiff alleges that Copestick and Schieber assaulted him in retaliation for plaintiff's grievance against them. *See* Compl. at 6,13. To state a claim of retaliation under the First Amendment, a plaintiff must allege facts plausibly suggesting the following: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff – namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)). The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act." *Dawes*, 239 F.3d at 491, *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)); *Franco v. Kelly*, 854 F.2d 584, 590 (2d Cir. 1988).

*7 It is well-settled that filing a grievance is constitutionally protected conduct. *Johnson v. Eggersdorf*, 8 Fed.Appx. 140, 144 (2d Cir. 2001); *Graham v. R.J. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). A plaintiff can establish a causal connection that suggests retaliatory intent by showing that his protected activity was close in time to the complained-of adverse action. *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2001) (citations omitted). While there is no "bright line" defining the limits of the temporal relationship, courts in the Circuit have held that an adverse action taken within three months after a protected activity can reasonably be perceived as retaliatory. *See Gorman-Bakos v. Cornell Coop. Extn. of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001); *see also Ashok v. Barnhart*, No. 01-CV-1311, 289 F.Supp.2d 305, 314 (E.D.N.Y. Oct. 30, 2003) (the interval between a protected activity and an adverse action that results in a finding of retaliation is generally no more than several months).

At this juncture, the Court finds that plaintiff's retaliation claims against Copestick and Schieber survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

#### 2. Religious Claims

Plaintiff alleges that the defendants violated his religious rights because he was unable to participate in Ramadan and denied his religious meals as a direct result of the false misbehavior report. Dkt. No. 1 at 5-6.

Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause. *See Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). "Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, [however,] are the interests of prison officials charged with complex duties arising from administration of the penal system." *Id.* (citing *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990)). To state a First Amendment Free Exercise claim, a plaintiff must allege that (1) the practice asserted is religious in the person's scheme of beliefs, and that the belief is sincerely held; (2) the challenged practice of the prison officials infringes upon the religious belief; and (3) the challenged practice of the prison officials furthers some legitimate penological objective. *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988) (citations omitted). A prisoner "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord*, 467 F.3d 263, 274–75 (2d Cir. 2006) (citing *Ford*, 352 F.3d at 591). [8] A religious belief is "sincerely held" when the plaintiff subjectively, sincerely holds a particular belief that is religious in nature. *Ford*, 352 F.3d at 590. A prisoner's sincerely held religious belief is "substantially burdened" where "the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin*, 76 F.3d 468, 476–77 (2d Cir. 1996). Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (quoting *Ford*, 352 F.3d at 595) (punctuation omitted).

**\*8** In this case, plaintiff has not alleged who issued the misbehavior report and it is not attached to the complaint. An inmate "has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schneider*, 105 F.3d 857, 862 (2d Cir. 1997). While a false misbehavior report may give rise to a claim under § 1983 "when done in retaliation for the exercise of a constitutional right," *Willey v. Kirkpatrick*, 801 F.3d 51, 63 (2d Cir. 2015), here there is no such allegation. While the deprivation of religious meals in SHU may be sufficient to state a claim, *see Williams v. Does*, 639 Fed.Appx. 55, 56 (2d Cir. 2016); *Skates v. Shusda*, No. 9:14-CV-1092 (TJM/DEP), 2016 WL 3882530, at \*\*4-5 (N.D.N.Y. May 31, 2016), here there is no indication that the defendants had any personal involvement in that conduct. The allegations, without more, fail to plausibly suggest that any defendant burdened plaintiff's right to freely practice his religion. Thus, plaintiff's First Amendment claims against are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### D. Fourteenth Amendment

#### 1. Equal Protection/Discrimination

Plaintiff claims that the September 30, 2013 assault was racially motivated. *See* Compl. at 6, 12. "When verbal harassment and simultaneous physical abuse ... are considered together, [courts] have little doubt concluding that plaintiff's allegations [are] sufficient to state a § 1983 claim for discrimination on the basis of race. *Cole v. Fischer*, 379 Fed.Appx. 40, 43 (2d Cir. 2010). "Under the Fourteenth Amendment's Equal Protection clause, a plaintiff may be able to recover for a physical assault that would not meet the objective threshold for Eighth Amendment excessive force claims, if the defendant's conduct was motivated by racial or religious discrimination." *Bhuiyan v. Wright*, No. 9:06-CV-409 ATB, 2011 WL 1870235, at \*9 (N.D.N.Y. May 13, 2011) (citation omitted).

At this juncture, plaintiff has sufficiently plead a Fourteenth Amendment equal protection claim to warrant a response from Copestick and Schieber. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

#### 2. Due Process

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

Plaintiff claims that defendants violated his due process rights when they failed to replace plaintiff's eyeglasses. *See* Compl. at 10. Plaintiff also asserts that his Fourteenth Amendment rights were violated because he was improperly confined to the SHU without a hearing as a result of a false misbehavior report. *See id.* at 10. During his SHU confinement, was allegedly unable to participate in Ramadan, denied his religious meals, denied parole, and excluded from mental health programs. *See id.*

### a. Property Claim

The Supreme Court has held that the negligent or intentional deprivation of prisoner's property may not be the basis for constitutional claims if sufficient post deprivation remedies are available to address the claim. *Hudson v. Palmer*, 468 U.S. 517, 531 (1984) (citing *Parratt v. Taylor*, 451 U.S. 527, 541 (1981)); *Davis v. New York*, 311 Fed.Appx. 397, 400 (2d Cir. 2009) (An alleged loss of property, "whether intentional or negligent – will not support a due process claim redressable under § 1983 if 'adequate state post-deprivation remedies are available.' ") (quoting *Hudson*, 468 U.S. 533). "New York in fact affords an adequate post-deprivation remedy in the form of, *inter alia*, a Court of Claims action." *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001). Because plaintiff has access to adequate state law remedies, he has not been deprived of property without due process of law and therefore cannot state a claim for relief pursuant to Section 1983. *See Love v. Coughlin*, 714 F.2d 207, 208-09 (2d Cir. 1983) (per curiam); *see also Aziz Zarif Shabazz v. Pico*, 994 F.Supp. 360, 473-74 (S.D.N.Y. 1998) (dismissing the plaintiff's claim that defendants destroyed his eyeglasses in violation of his due process rights). Thus, plaintiff's due process claims related to his eyeglasses are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### b. SHU Confinement

**\*9** To establish a due process claim, plaintiff must establish: "(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001) (citation and internal quotation marks omitted). In this case plaintiff alleges that the false misbehavior report resulted in a SHU sentence. [9]

A prisoner "has a liberty interest that is implicated by SHU confinement if it 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *J.S. v. T'Kach*, 714 F.3d 99, 106 (2d Cir. 2013) (quoting *Sandin v. Conner*, 515 U.S. 472, 484, (1995)); *see also Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). In making this determination courts are to consider, "among other things, the duration and conditions of confinement." *J.S.*, 714 F.3d at 106; *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009). The conditions of confinement are to be considered "in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such conditions are imposed in the ordinary course of prison administration." *Davis*, 576 F.3d at 134; *Palmer*, 364 F.3d at 66 n.4.

Although the Second Circuit has "explicitly avoided" creating "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights," the Court has established guidelines. *Palmer*, 364 F.3d at 65. W here the plaintiff is confined for "an intermediate duration –between 101 and 305 days – 'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required.' " *Id.* (quoting *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000)). While confinements for less than 101 days "under normal SHU conditions may not implicate a prisoner's liberty interest," such confinements "could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealy* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer*, 364 F.3d at 65; *see Davis*, 576 F.3d at 133. [10]

**\*10** In this case, the duration of the confinement, 30 to 60 days, "was not long enough to constitute an atypical and significant deprivation by itself," and the Court therefore must "look to the conditions of confinement." *Palmer*, 364 F.3d at 66; *see also*

*Davis*, 576 F.3d at 133. Plaintiff claims that while he was confined in the SHU, he was unable to participate in Ramadan, denied his religious meals, denied parole, and excluded from his mental health program. *See* Compl. at 5, 10; Dkt. No. 1-1 at 1.

It is well established that prisoners do not have a constitutional right to parole. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). "Where a state has created a statutory scheme for parole, the Due Process Clause protects prisoners insofar as they 'have a legitimate expectancy of release that is grounded in the state's statutory scheme.' " *Barna v. Travis*, 239 F.3d 169, 170–72 (2d Cir. 2001) (per curiam) (citing *Greenholtz*, 442 U.S. at 11–13). "New York's parole scheme is not one that creates in any prisoner a legitimate expectancy of release." *Barna*, 239 F.3d at 171. Plaintiff has also failed to plead that his inability to participate in mental health programs impacted a protected liberty interest. *See Nieves v. Prack*, No. 6:15-CV-6101, 2016 W L 1165820, at *4 (W.D.N.Y. March 24, 2016) ("[Plaintiff's] claim that his inability ... to participate in various educational, vocational, rehabilitative or self-help programs might have hindered his ability to receive an early parole or release is ... speculative and fails to allege interference with a protected liberty interest.") (citations omitted). Here, the complaint lacks facts establishing when, how many times, and who deprived plaintiff of the right to attend his mental health program. With respect to plaintiff's religious claims, courts have found that the deprivation of communal religious services does not constitute an atypical and significant hardship. *See Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (finding that eighteen days in administrative segregation, including loss of exercise and access to religious services, did not constitute atypical and significant hardship); *Holland v. Goord*, No. 05-CV-6295, 2006 WL 1983382, at *7 (W.D.N.Y. July 13, 2006) (holding the inability to attend Muslim services and celebrate the end of Ramadan while confined in the SHU for seventy-seven days is not an atypical hardship).

Even assuming that plaintiff had pled facts sufficient to show that his confinement imposed an atypical and significant hardship, however, and therefore pled the existence of a valid liberty interest, the complaint fails to state a claim based upon the Fourteenth Amendment and due process. It is well settled that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)). In this case, a hearing regarding the charges was held within two days of plaintiff's receipt of the misbehavior report. Plaintiff does not allege that he was denied any procedural due process during that hearing. Moreover, the complaint lacks facts suggesting that any named defendant issued the misbehavior report or presided over the disciplinary hearings. Based upon the aforementioned, plaintiff's Fourteenth Amendment claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. *See Livingston v. Kelly*, 561 F.Supp.2d 329, 332 (W.D.N.Y. 2008) (dismissing plaintiff's false-report claims because the plaintiff failed to allege that the disciplinary hearings on the reports did not meet constitutional due process standards).

### E. Failure to Respond to Grievances and Failure to Investigate

**\*11** Plaintiff also claims that his constitutional rights were violated because the facility grievance program is "never followed." *See* Compl. at 11. There is no constitutional right of access to the established inmate grievance program. *Davis v. Buffardi*, No. 9:01-CV-0285 (PAM/GJD), 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) ("[p]articipation in an inmate grievance process is not a constitutionally protected right"); *Shell v. Brzezniak*, 365 F.Supp.2d 362, 369-70 (W.D.N.Y. 2005) ("[i]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim"); *Cancel v. Goord*, No. 00. Civ. 2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) ("inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983"); *Mimms v. Carr*, No. 09-CV-5740, 2011 W L 2360059, at *10 (E.D.N.Y. June 9, 2011) ("It is well-established that prison grievance procedures do not create a due-process-protected liberty interest.") (citing cases). Simply stated, there is no underlying constitutional obligation to afford an inmate meaningful access to the internal grievance procedure, or to investigate and properly determine any such grievance.

To the extent that plaintiff attempts to assert a separate constitutional claim based upon the Inspector General's failure to investigate, the law is also clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials. *Bernstein v. New York*, 591 F.Supp.2d 448, 460 (S.D.N.Y. 2008) (collecting cases); *Torres v. Mazzuca*, 246 F.Supp.2d 334, 341-42 (S.D.N.Y. 2003) (Prisoners do not have a due process right to a thorough investigation of grievances.); *DeShaney v.*

Case 1:25-cv-00341-LEK-MJK    Document 3    Filed 03/28/25    Page 25 of 62
Houston v. Cofferman, Not Reported in Fed. Supp. (2016)
2016 WL 6267968

*Winnebego Soc. Servs.*, 489 U.S. 189, 196 (1989) (The Due Process Clause confers no right to governmental aid, even where that aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual); *Pine v. Seally*, No. 9:09-CV-1198, 2011 W L 856426, at *9 (N.D.N.Y. Feb. 4, 2011) ("the law is ... clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials") (citing *Bernstein*, 591 F.Supp.2d at 460).

In this regard, plaintiff's claims do not involve a constitutional violation and are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

**F. Cause of Action for Criminal Charges/Perjury**

"New York does not recognize a common law cause of action for [...] perjury." *Harris v. Summers*, No. 5:14-CV-0013 (LEK/DEP), 2014 W L 1340032, at *5 (N.D.N.Y. Apr. 3, 2014) (citing *Carvel v. Ross*, No. 12-CV-0722, 2011 W L 856283, at *12 (S.D.N.Y. Feb. 16, 2011) (dismissing the plaintiff's perjury claim because "there [is] no private right of action" for perjury)). Moreover, plaintiff's claim is not actionable because it is well-settled that a private citizen does not have a constitutional right to bring a criminal complaint against another individual. *Harper v. New York Child Welfare Comm'rs,* No. 3:12-CV-0646 (NAM/DEP), 2012 WL 3115975, at *4 (N.D.N.Y. May 14, 2012) (citing *Linda R.S. v. Richard D.,* 410 U.S. 614, 619 (1973)). Consequently, plaintiff's request to charge defendants with "perjury" is dismissed for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).

**G. Injunctive Relief Against DOCCS**

Plaintiff demands injunctive relief directing DOCCS to require "each officer" to wear body cameras to prevent future assaults and other related injunctive relief. *See* Compl. at 10-12. Plaintiff is presently confined at Mid-State C.F. and therefore, plaintiff's request for injunctive relief involving changes to the operation of security at Elmira C.F., is dismissed as moot. *See Edwards v. Horn*, No. 10 Civ. 6194, 2012 WL 760172, at *23 (S.D.N.Y. March 8, 2012) (dismissing the plaintiff's claim for injunctive relief because the plaintiff had been released from prison).

*12  Even assuming plaintiff's request is broader and intended to encompass all DOCCS facilities, the request is nonetheless improper and subject to dismissal. The PLRA provides "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of the particular plaintiff." 18 U.S.C. § 3626(a)(1)(A). "[A] proposed order directing the installation of securities cameras – is beyond the narrow scope permitted by the PLRA." *Barrington v. New York*, 806 F.Supp.2d 730, 750 (S.D.N.Y. 2011) (dismissing the plaintiff's request for injunctive relief seeking an order directing Green Haven to install security cameras as overly broad and unnecessary to correct the alleged past violations of his rights). Accordingly, plaintiff's request for injunctive relief is dismissed.

**VI. Conclusion**

**ORDERED** that plaintiff's in forma pauperis application (Dkt. No. 2) is **GRANTED**; [11] and it is further

**ORDERED** that the Clerk provide the Superintendent of the facility, designated by plaintiff as his current location, with a copy of plaintiff's authorization form, and notify the official that this action has been filed and that plaintiff is required to pay the entire statutory filing fee of $350.00 pursuant to 28 U.S.C. § 1915; and it is further

**ORDERED** that the Clerk of the Court provide a copy of plaintiff's inmate authorization form to the Financial Deputy of the Clerk's Office; and it is further

**ORDERED** that the following claims are **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted: (1) plaintiff's § 1983 claims for monetary damages against DOCCS; (2) constitutional claims based upon the failure to adhere to the grievance policy and investigate; and (3) plaintiff's claims related to perjury and filing criminal charges against defendants; and it is further

**ORDERED** that the following claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted: (1) Eighth Amendment claims against defendants for deliberate indifference to plaintiff's serious medical needs; (2) First Amendment freedom of religion claims; (3) Fourteenth Amendment due process claims; and (4) claims for injunctive relief against DOCCS [12]; and it is further

**ORDERED** that DOCCS is **DISMISSED** as a defendant herein; and it is further

**ORDERED** that the following claims survive the Court's sua sponte review under 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) and require a response: (1) the Eighth Amendment use of excessive force claims against defendants Copestick and Schieber; (2) the Eighth Amendment failure-to-intervene claim against defendant Collerman; (3) the First Amendment retaliation claims against defendants Copestick and Schieber; and (3) the Fourteenth Amendment equal protection claims against Copestick and Schieber; and it is further

**ORDERED**, that the Clerk shall issue summons and forward them, along with copies of the Complaint, to the United States Marshal for service upon the remaining defendants. The Clerk shall forward a copy of the Summons and Complaint to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

 **\*13** **ORDERED**, that a response to the complaint be filed by the remaining defendants, or their counsel, as provided for in the Federal Rules of Civil Procedure;

**ORDERED**, that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; their failure to do so will result in the dismissal of his action**; and it is further

**ORDERED**, in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009), the Clerk of the Court is directed to provide plaintiff with copies of opinions from Westlaw and the Federal Appendix cited in this Decision and Order; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Decision and Order on plaintiff in accordance with the Local Rules.


Dated: October 26, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6267968

---

**Footnotes**

2016 WL 6267968

1    On October 20, 2016, the Court issued a Decision and Order upon initial review of plaintiff's complaint. Dkt. No. 4. This Amended Decision and Order is issued to correct clerical errors in the Conclusion of the Order.

2    Section 1915(g) prohibits a prisoner from proceeding in forma pauperis where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions or appeals that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(g). Based upon the Court's review of plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service, it does not appear that plaintiff has accumulated three strikes for purposes of 28 U.S.C. § 1915(g).

3    To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989).

4    Plaintiff annexed exhibits to the complaint. Dkt. No. 1-1. To the extent that the exhibits are relevant to the incidents described in the complaint, the Court will consider the complaint as well as any documents attached as exhibits. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991) (the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference).

5    The Use of Force report was not annexed as an exhibit to the complaint.

6    The name of the officer who served the misbehavior report is not clearly legible on the Hearing Disposition annexed as an exhibit. *See* Dkt. No. 1-1 at 10. Plaintiff does not allege that Copestick, Schieber, or Collerman delivered the report. The disposition form indicates that the charges were reported by Schieber. *Id.* The misbehavior report was not annexed as an exhibit to the complaint.

7    The officer who presided over the hearing was a Captain at Elmira C.F. However, the name of the hearing officer is not clearly legible. *See* Dkt. No. 1-1 at 10-11.

8    The Second Circuit has yet to decide whether the "substantial burden" test survived the Supreme Court's decision in *Emp't Div. v. Smith,* 494 U.S 872, 887 (1990), in which the Court suggested that application of the test "puts courts in 'the unacceptable business of evaluating the relative merits of differing religious claims.' " *Ford,* 352 F.3d at 592 (quoting *Emp't Div.,* 494 U.S. at 887); *see also Williams v. Does,* 639 Fed.Appx. 55, 56 (2d Cir. May 6, 2016) ("We have not yet decided whether a prisoner asserting a free-exercise claim must, as a threshold requirement, show that the disputed conduct substantially burdened his sincerely held religious beliefs."); *Holland v. Goord,* 758 F.3d 215, 220-21 (2d Cir. 2014) (declining to decide whether a prisoner must show, as a threshold matter, that the defendants' conduct substantially burdened his sincerely held religious beliefs in connection with a First Amendment free exercise claim). In the absence of any controlling precedent to the contrary, I have applied the substantial-burden test in this matter.

9    The complaint contains conflicting factual allegations related to the length of plaintiff's SHU confinement. Plaintiff claims that after "one month of being housed in SHU," he was released. *See* Compl. at 5. In the Third Cause of Action, plaintiff claims that he served "over 60 days in SHU." *See id.* at 9.

10    The Second Circuit has noted that "[i]n the absence of a detailed factual record, we have affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short –less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions." *Palmer,* 364 F.3d at 65-66; *see Davis,* 576 F.3d at 133. Absent allegations in the complaint that the conditions of confinement were in some way atypical, however, many courts in this Circuit have granted motions to dismiss claims by plaintiffs with confinement exceeding thirty days when the plaintiffs failed to allege that the conditions of confinement were in some way atypical. *See, e.g., Acevedo v. Fischer,* No. 12-CV-6866, 2014 WL 5015470 at *15 (S.D.N.Y. Sept. 29, 2014) (citing cases involving confinements of between forty and fifty days which were dismissed for failure to allege a protected liberty interest because there were no allegations of unusual confinement).

Houston v. Collerman, Not Reported in Fed. Supp. (2016)
2016 WL 6267968

11    Plaintiff should note that, although the Court has granted his application to proceed in forma pauperis, he will still be
      required to pay fees that he may incur in this action, including copying and/or witness fees.

12    If plaintiff wishes to pursue any claim dismissed without prejudice, he is advised to that, if accepted for filing, any
      amended complaint will entirely replace the original complaint and incorporation of prior claims is not permitted.

---

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 5120017

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.

Terri MIEHLE-KELLOGG, individually and as Administratrix of the Estate of

Walter Kellogg, deceased, and Terri Miehle-Kellogg, individually, Plaintiffs,

v.

COUNTY OF SUFFOLK, Defendant.

19-cv-04943 (GRB) (JMW)

|

Signed December 16, 2024

**Attorneys and Law Firms**

Mark C. Kujawski, Esq., Kujawski & Kujawski PLLC, 98 Carleton Avenue, Central Islip, New York 11722, Attorney for Plaintiffs.

Callan Wright Tauster, Esq., Suffolk County Department of Law, H. Lee Dennison Building, 100 Veterans Memorial Highway, P.O. Box 6100, Hauppauge, NY 11788, Attorney for Defendant.

**MEMORANDUM AND ORDER**

WICKS, Magistrate Judge:

 **\*1**  The issue presented in this latest motion to amend is whether New York's Executive Order 202.8 – enacted in response to the COVID-19 pandemic – effectively tolled (or added time) to the limitations period of Plaintiff's § 1983 claims. What might seem relatively straightforward has become a Gordian Knot of sorts, as the New York Court of Appeals has rendered recent decisions construing the operation of 202.8, as have several district courts within this Circuit. For the reasons that follow, since Executive Order 202.8 in fact tolled (or added) time to the period within which Plaintiffs' claims could be asserted, Plaintiffs' Second Motion to Amend the Complaint (ECF No. 47) is **GRANTED**. [1]

**BACKGROUND**

**I. Procedural History**

Plaintiffs, Terri Miehle-Kellogg, individually and as Administratrix of the Estate of Walter Kellogg, and Terri Miehle-Kellogg ("Plaintiffs") originally commenced this action on August 29, 2019, asserting claims against Defendants "Officer John Doe," in both his individual and official capacities, the County of Suffolk, and the Suffolk County Police Department for: (i) violations of the Americans with Disabilities Act, 42 U.S.C. § 12132 ("ADA"), (ii) municipal liability under *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("*Monell*"), (iii) violation of the right to be free from unreasonable search and seizure under the Fourth and Fourteenth Amendments, and (iv) state law claims for negligence assault, battery, unlawful detention, negligent and intentional infliction of emotional distress, and intentional tort, arising out of the death of Mrs. Miehle-Kellogg's husband, Walter Kellogg, who was shot by Suffolk County Police Officer Frank Santanello ("Officer Santanello") on December 15, 2018. (*See* generally, ECF No. 1.) On January 31, 2022, Plaintiff first requested leave to amend the Complaint to substitute Office Santanello for the "John Doe" defendant, and formally moved to amend the Complaint on May 10, 2022. (ECF No. 29.) Simultaneously, Defendants moved for summary judgment on all claims asserted in the Complaint. (ECF No. 27.)

**\*2**  On March 24, 2023, addressing both Plaintiffs' motion to amend and Defendants' motion for summary judgment, District Judge Gary R. Brown denied Plaintiffs' motion to amend the complaint to add the identity of Officer Santanello and dismissed the claims against John Doe. *See Miehle-Kellogg v. Doe*, No. 19-CV-4943(GRB)(JMW), 2023 WL 2632452, at \*11 (E.D.N.Y. Mar. 24, 2023), *appeal withdrawn*, No. 23-669, 2023 WL 7182119 (2d Cir. Aug. 3, 2023). Judge Brown further dismissed Plaintiffs' "failure-to-train *Monell* claim, the ADA claim, and the state law claims," but denied Defendants' motion for summary judgment as to the "failure-to-supervise *Monell* claim." *Id.* at \*1 ("[W]hile most of the claims are subject to dismissal, the Court finds that, drawing all inferences in [P]laintiffs' favor, sufficient disputed facts remain as to the failure-to-supervise claim regarding Officer Santanello and there is sufficient evidence supporting a *Monell* pattern or practice such that the claim must proceed to trial.").

Following completion of limited discovery (*see* Electronic Order dated October 16, 2023), and the parties' submission of the Joint Proposed Pretrial Order (ECF No. 43), on February 2, 2024, the undersigned returned this matter to Judge Brown as trial ready. (*See* Electronic Order dated February 2, 2024.) On July 30, 2024, Plaintiffs requested leave to renew their motion to amend the pleadings on the heels of two recent New York Court of Appeals' decisions *Favourite Ltd. v. Cico*, 42 N.Y.3d 250, 243 N.E.3d 494, 496 (N.Y. 2024) ("*Favourite*") and *Jaime v. City of New York*, 41 N.Y.3d 531, 237 N.E.3d 796 (N.Y. 2024) ("*Jamie*"). On August 1, 2024, Judge Brown withdrew Plaintiffs' letter requesting a pre-motion conference to renew plaintiff's motion to amend the pleadings and advised that any motions to amend the pleadings must be redirected to the undersigned. (*See* Electronic Order dated August 1, 20234.) Plaintiffs filed their Second Motion to Amend on October 7, 2024 (ECF No. 47), which Defendants opposed that same day. (ECF No. 48.) The parties appeared for an oral argument on Plaintiffs' motion before the undersigned on December 11, 2024. (ECF No. 50.)

## II. Factual Background

The Court assumes the parties' familiarity of the factual background and procedural history of this case as described in Judge Brown's March 24, 2023 Memorandum of Decision & Order, *see Miehle-Kellogg* No. 19-CV-4943(GRB)(JMW), 2023 WL 2632452, at \*1 (hereafter, the "M&O"), and includes only facts relevant to the instant motion to amend.

On December 15, 2018, Mrs. Miehle-Kellogg called 911 seeking help for her husband Walter Kellogg who was experiencing a mental health crisis. *Id.* Ms. Miehle-Kellogg told the dispatcher that her husband was suicidal, had a history of mental health issues, and was not acting violent towards anyone. *Id.* Officer Frank Santanello arrived at the house and then walked with Ms. Miehle-Kellogg toward the door of the house. *Id.* Upon approaching the doorway, Officer Santanello asked Mr. Kellogg to come outside and speak with him. *Id.* Ms. Miehle-Kellogg opened the door, and Mr. Kellogg came out with a 1.5-inch paring knife in his right hand. *Id.* Officer Santanello then asked about Mr. Kellogg's intentions. He replied, "I want to cut myself, I want to go to the hospital." *Id.*

Ms. Miehle-Kellogg took the knife out of her husband's hand, reached around Mr. Kellogg, and placed the knife on a microwave oven next to the door. *Id.* At this point, Ms. Miehle-Kellogg was standing just outside the door, Mr. Kellogg was in the doorway, and Officer Santanello was by a table in the yard across from the doorway. *Id.* Ms. Miehle-Kellogg walked a few steps in front of Mr. Kellogg, and then he took out a utility knife. *Id.* Mr. Kellogg lifted his shirt and said, "I'm going to cut myself stem to stern," and proceeded to slice his skin with two cuts. *Id.* At this point, Ms. Miehle-Kellogg heard several gunshots. *Id.* When Ms. Miehle-Kellogg heard the shots, she was about three feet from her husband and the officer was behind her by the table. *Id.* According to Plaintiffs' ballistics expert, Officer Santanello shot Mr. Kellogg six times from a distance of greater than 36 inches. *Id.* Mr. Kellogg was likely within two or three feet of the front door when he was shot. *Id.* Ms. Miehle-Kellogg alleges she was unlawfully detained by the officer following the shooting. *Id.* Plaintiffs did not file a Notice of Claim pursuant to the New York State General Municipal Law in relation to any of the claims arising out of Mr. Kellogg's death. *Id.* at \*2.

**\*3**  Officer Santanello has been the subject of at least twenty-one investigations by the Internal Affairs Bureau ("IAB") during his time as an officer. *Id.* Of the thirteen investigations regarding Officer Santanello's use of excessive force before Mr. Kellogg's death, the IAB found the allegations were unsubstantiated in eight instances and "exonerated" him in five. *Id.* Following Mr.

Kellogg's death, five IAB investigations found that allegations against Officer Santanello for failure to perform duty, making false statements, improper police conduct, unprofessional language, and rules and procedures violations were substantiated. *Id.*

The Complaint, filed on August 29, 2019, names an "Officer John Doe" as a defendant in both his individual and official capacities, and asserts (i) violations of the ("ADA"), (ii) municipal liability under *Monell*, (iii) violation of the right to be free from unreasonable search and seizure under the Fourth and Fourteenth Amendments, and (iv) state law claims for negligence assault, battery, unlawful detention, negligent and intentional infliction of emotional distress, and intentional tort. (*See* generally, ECF No. 1.) As determined by the M&O:

> That Frank Santanello was the officer who responded to the call and shot plaintiff-decedent is undisputed. Indeed, the County identified Officer Santanello as the only officer involved in the shooting in its interrogatory responses provided to plaintiff on August 20, 2020. Further, [P]laintiffs filed a motion to compel production of Santanello's personnel file on October 2, 2020, demonstrating unequivocal knowledge of the "John Doe" officer's identity as of that date. And, on March 17, 2021, Officer Santanello was deposed at the County's office, a deposition defended by then Deputy Suffolk County Attorney Brian Mitchell.

*Miehle-Kellogg*, No. 19-CV-4943(GRB)(JMW), 2023 WL 2632452, at *5.

### III. Plaintiffs' First Motion to Amend

As stated, Plaintiffs' First Motion to Amend sought to substitute the name of Officer Frank Santanello for the "Office John Doe." *Id.* at *1. The M&O ultimately denied Plaintiffs' first motion "due to the expiry of the relevant limitations periods" and emphasized that " 'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued.' " *Id.* at *5 (quoting *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013)) ("*Hogan*"). The M&O noted that "while a defendant can initially be named as a John Doe defendant, failure to name that defendant within the applicable statute of limitations period requires dismissal of the claim" and, therefore, " 'John Doe' substitutions may only be accomplished when all of the specifications of Fed. R. Civ. P. 15(c) are met[,]" and held that Plaintiffs could not satisfy the requirements of Rule 15(c):

> This is not a case in which [P]laintiffs were mistaken as to the identity of a party at the time of filing and now seek to remedy that misidentification. Rather, [P]laintiffs merely lacked knowledge of the officers' name at the time of filing. In this Circuit, amendment in this instance is impermissible [under Rule 15(c)(1)(C)] [2].

> Under Rule 15(c)(1)(A), an amended pleading may relate back to an earlier-filed complaint when "the law that provides the applicable statute of limitations allows relation back. New York state law provides the three-year statute of limitations applicable to § 1983 claim. The incident leading to Plaintiff-Decedent's death occurred on December 15, 2018, meaning the statute of limitations expired on December 15, 2021.

*Id.* at *6 (internal citations omitted) (cleaned up).

**\*4**  The M&O further held that Plaintiffs' proposed amendment did not otherwise relate back to original Complaint under the New York Civil Practice Law and Rules ("CPLR") Section 1024, which "provide[s] a special amendment procedure for claims alleged against John Doe defendants." *Id.* Section 1024 provides:

> A party who is ignorant, in whole or in part, of the name or identity of a person who may properly be made a party, may proceed against such person as an unknown party by designating so much of his name and

identity as is known. If the name or remainder of the name becomes known all subsequent proceedings shall be taken under the true name and all prior proceedings shall be deemed amended accordingly.

N.Y. CPLR § 1024. The M&O reasoned that in order to "obtain the benefit of Section 1024, a plaintiff must demonstrate that he/she exercised due diligence, prior to the statute of limitations, to identity the defendant by name[,]" and found:

> Section 1024 does not provide a basis for [P]laintiffs' proposed amendment to relate back to the original date of filing. Plaintiffs did not file their request to amend the complaint until January 31, 2022, indisputably well after the statute of limitations had run. Plaintiffs were aware of Officer Santanello's identity, at the latest, as of his deposition on March 17, 2021—long before the statute of limitations had run. Further, [D]efendants had identified Officer Santanello in their August 20, 2020 responses to plaintiffs' interrogatories, giving [P]laintiffs even more time to properly amend. Though plaintiffs point to the County's delay in responding to their initial inquiry seeking the name of the officer involved in the shooting, this fact alone does not warrant a different outcome. Thus, [P]laintiffs' proposed amended complaint does not relate back under Section 1024.

*Id.* at *7 (internal citations omitted) (cleaned up). [3] The Court denied Plaintiffs' First Motion to Amend to include Officer Santanello and dismissed the claims against John Doe. *Id.*

## IV. **Plaintiffs' Second Motion to Amend**

Plaintiffs' Second Motion to Amend the Complaint again seeks to substitute Defendant "Officer Frank Santanello" for "Officer John Doe" pursuant to N.Y. CPLR § 1024, in light of New York State Court of Appeals decisions in *Favourite* and *Jamie*. (*See* ECF No. 47 at 1.) Plaintiffs contend *Favourite* and *Jamie* "resolved the dispute that the Executive Order 202.8 *tolled*, and did not merely *suspend*, time limits including substitutions under NY CPLR § 1024." (*Id.* at 1-2) (emphasis added). To this end, Plaintiffs contend the time limit for the substitution in this case actually expired on August 1, 2022 – not December 15, 2021, as the M&O previously concluded, and therefore, Plaintiff's First Motion to Amend submitted on January 31, 2022 was timely. (*Id.* at 2.)

**\*5** Plaintiffs reiterate that the incident giving rise to the instant litigation took place on December 15, 2018, and Plaintiffs commenced the instant action against Defendant on August 29, 2019, "utiliz[ing] NY CPLR § 1024 to bring the action against the involved officer as the name of the officer who shot and killed [Mr. Kellogg] was not known at the time." (*Id.* at 4.) Subsequently, on March 20, 2020, New York passed Executive Order 202.8, which directed, in part:

> [A]ny specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding, as prescribed by the procedural laws of the state, including but not limited to the criminal procedure law, the family court act, the civil practice law and rules, the court of claims act, the surrogate's court procedure act, and the uniform court acts, or by any other statute, local law, ordinance, order, rule, or regulation, or part thereof, is hereby tolled.

(*Id.*) (quoting N.Y. Exec. Order 202.8). The Governor of New York later issued nine subsequent executive orders that extended the suspension. (*See* Executive Order Nos. 202.14, 202.28, 202.38, 202.48, 202.55, 202.55.1, 202.60, 202.67, 202.72.) Plaintiffs argue that "[a]bsent Executive Order No. 202.8, and the extensions of same, the time limit for a NY CPLR § 1024 substitution

in this case would have been December 15, 2021." (*Id.*) Plaintiffs further identify that following this Court's denial of their First Motion to Amend, the New York Court of Appeals issued two decisions on the impact that Executive Order No. 202.8, and the extensions of same, had on the applicable time limits – *Favourite* and *Jamie* – which both held that the Executive Orders "constituted a toll and not a stay, extending any statute of limitations or similar time limit that had not already expired as of March 20, 2020, were automatically extended by 228 days—whether it would otherwise have expired before November 3, 2020, or afterwards." (*Id.* at 5.) As such, Plaintiffs contend the "time limit to substitute a party pursuant to NY CPLR § 1024 in this action was extended to August 1, 2022, and not December 15, 2021, at the Court previously calculated[,]" and, therefore, "as of January 31, 2022, the time Plaintiff sought to amend the complaint to substitute Santanello for Doe, the substitution time limit had not yet run." (*Id.*)

Even if the Executive Orders do not toll the statute of limitations under § 1983, Plaintiffs argue they "toll a substitution under NY CPLR § 1024." (*Id.* at 6.) Plaintiffs contend they do not "seek to *commence* an action but, instead, to amend a complaint in an existing action where a fictious name was used as Santanello's name was unknown prior to the commencement of the action." (*Id.* at 7.) Accordingly, if this "Court chooses not to apply the tolling of the Executive Orders to solely federal time limits," Plaintiffs maintain "the toll will nevertheless apply to this action due to the 'special amendment' created by state law under NY CPLR § 1024" that was "used in denying the prior motion [to amend]." (*Id.* at 9.) Overall, Plaintiffs contend the time limit to substitute a party pursuant to NY CPLR § 1024 in this action was extended to August 1, 2022 – and not December 15, 2021 as the Court previously calculated – and Plaintiff" "previous motion to amend should be permitted to be renewed and granted." (*Id.*)

In their Response in Opposition, Defendants argue the cases cited by Plaintiff "do not stand for the proposition that Executive Order 202.8 requires that the Court add an additional 228 days to the relevant limitations period, regardless of whether the original deadline fell within the 'tolling period.' " (ECF No. 48 at 7-8.) *First*, Defendants contend the New York Court of Appeals discussed Executive Order 202.8 and the applicable tolling/suspension period in *Favourite* "in a limited context" and "the relevant facts of that case are dissimilar to the instant one[:]"

  **\*6**  In *Favourite*, the Appellate Division, First Department dismissed plaintiffs' second amended complaint in its entirety for lack of standing, leaving only the defendants' counterclaims pending. The Supreme Court then granted plaintiffs leave to file a third amended complaint to cure the standing issue, despite defendants' objections that plaintiffs were instead required to file a new action. The Appellate Division sided with the defendants, holding that the Supreme Court had no discretion to grant leave to amend a complaint that had been dismissed by the Appellate Division, and that the amendment was time-barred.

  The Court of Appeals was then faced with the question as to whether the Appellate Division's decision required the plaintiff to commence a separate action, instead of seeking leave to file a third amended complaint. The Court of Appeals also touched on whether the motion to amend was timely—the Appellate Division order dismissing the complaint was made on March 3, 2020. On March 20, 2020, Governor Cuomo enacted Executive Order 202.8, which remained in effect until November 3, 2020. Plaintiff filed the motion seeking leave on January 8, 2021 and the Court of Appeals was deemed it timely.

(*Id.* at 8.) (citing *Favourite*, 243 N.E.3d at 502). Defendants contend the "major difference between *Favourite* and the instant matter is that the statute of limitations to file the motion seeking leave to amend would have run, but for Executive Order 202.8.... [h]ad the Executive Order not been enacted, [the] plaintiff in *Favourite* would have been required to file the motion within the six-month limit; or by September 3, 2020. Executive Order 202.8 was still in effect for another two months following the date the statute of limitations would have run in *Favourite.*" (*Id.* at 8-9.) (citing *Favourite*, 243 N.E.3d at 502).

Defendants contend that here, the date Plaintiffs' claims accrued was on December 15, 2018, requiring them to file their Complaint naming Santanello by December 15, 2021, and, as Executive Order 202.8 ended on November 3, 2020, "Plaintiffs still had over 13 months to file a motion seeking leave to amend the complaint before the statute of limitations ran." (*Id.* at 9.) The Defendants argue they identified Santanello in their August 20, 2020 interrogatory responses, three months prior to the expiration of Executive Order 202.8, and Plaintiffs' counsel deposed Santanello on March 17, 2021, nine months prior to the statute of limitations deadline of December 15, 2021. (*Id.*) Defendants maintain "[t]he case law simply does not support

Plaintiff[s'] argument that [they] should have been permitted an additional 228 days to amend [their] Complaint, despite the statute of limitations elapsing more than a year after Executive Order 202.8 ended." (*Id.*) Defendants further maintain that *Favourite* was a state court case involving a situation where the Plaintiff's complaint had been dismissed for lack of standing and note that no operative complaint existed in *Favourite* until the Court of Appeals overturned the Appellate Division decision and, by contrast, Plaintiffs' Complaint is "still operative, and the federal courts only permit interlocutory appeals in limited circumstances." (*Id.*) Defendants insist that Plaintiffs' remedy is "to file an appeal of the decision denying [their] leave to appeal at the conclusion of the trial court case" and that Plaintiffs "should not be able to circumvent the [F]ederal [R]ules by filing yet another motion to amend under the guise of updated state court case law." (*Id.*)

*Second*, Defendants argue *Jamie* is also distinguishable from the instant case. (*Id.*) Specifically, Defendants contend:

> **\*7**  [*Jamie*,] the other case cited by the Plaintiff, involved filing a late notice of claim against the City of New York pursuant to General Municipal Law § 50-e. In such a case, notices of claim are required to be served within 90 days of the date of loss and the complaint to be served within a year and 90 days. [ ] *Jaime* barely touches on Executive Order 202.8.
>
> The Court of Appeals merely stated that the Plaintiff did not provide a valid excuse for filing a late notice of claim, because his claims were set to expire only days after the pandemic began. The Court of Appeals found that '[i]f anything, the pandemic benefited him by giving rise to the executive orders that tolled his claims.' Again, this is yet another case where the statute of limitations elapsed during the period Executive Order 202.8 was active and thus, is inapplicable to the present case.

(*Id.*) (quoting *Jaime*, 237 N.E.3d at 806). *Finally*, Defendants argue that this Court's decision in *Loeb v. Cnty. of Suffolk,* No. 22-CV-6410 (HG), 2023 WL 4163117, at *3 (E.D.N.Y. June 23, 2023) ("*Loeb*") resolves the issue of whether Executive Order 202.8 tolls or suspends the statute of limitations for Section 1983 claims:

> *Loeb* was a federal civil rights matter in which the underlying criminal action was resolved via settlement agreement, wherein the plaintiff agreed, *inter alia*, to waive his rights to bring civil suit against Suffolk County. While Judge Gonzalez did find that the settlement agreement did constitute a valid waiver of the plaintiff's right to file a civil suit, he also found that the plaintiff's claims were time-barred. Specifically, Judge Gonzalez found that Executive Order 202.8 suspended, rather than tolled the time periods to which it applied. Judge Gonzalez stated that the plaintiff's three-year statute of limitations period ended on March 23, 2022, and that Executive Order 202.8 expired on November 3, 2020. Despite having a year and four months after the expiration of Executive Order 202.8 to file his complaint, Loeb did not do so until October 21, 2022.
>
> Judge Gonzalez also wrote that Executive Order 202.8 was enacted to preserve litigants' rights during the COVID-19 pandemic. Judge Gonzalez further opined that interpreting it as a toll rather than a suspension was 'contrary to the spirit of the Executive Order,' and that '[a]ny other interpretation would provide an unwarranted windfall to litigants, such as [p]laintiff, who had claims that did not expire during the emergency period covered by the Executive orders.'

(*Id.* at 10-11) (quoting *Loeb*, No. 22-CV-6410 (HG), 2023 WL 4163117, at *3). Defendants argue that in this case, Plaintiffs' "rights were not impacted by the COVID-19 pandemic, as [they] had over a year following the suspension of the [E]xecutive [O]rder, to amend [their] complaint" and "[g]ranting [them] an additional 228 days on top of the three-year statute of limits would be a windfall to Plaintiff, as warned by Judge Gonzalez." (*Id.* at 11.) As such, Defendants maintain Plaintiffs' second motion to amend should be denied. (*Id.*)

In their Reply in Support, Plaintiffs argue that "contrary to Defendants' opposition, *Favourite* and *Jamie* together put to rest" the disputes as to whether the Executive Orders acted as a suspension or a toll, and held the Executive Orders constituted a toll. (ECF No. 47-3 at 4.) Plaintiffs' contend "there has been a clear shift in how Federal Courts are addressing the executive Order 202.8" – specifically, Plaintiffs rely on: (i) *McKinnies v. City of New York*, No. 23-CV-2567 (HG) (JRC), 2024 WL 4333703, at *4 (E.D.N.Y. Sept. 27, 2024); (ii) *In Re Nordlicht*, 115 F.4th 90 (2nd Cir. 2024); (iii) *Harris v. City of New York,* No. 22-CV-1763 (JGLC), 2024 WL 4335662, at *5 (S.D.N.Y. Sept. 27, 2024); (iv) *Liverpool v. City of New York*, No. 20-CV-4664 (ER), 2023 WL 7723165, at *8 (S.D.N.Y. Nov. 15, 2023); (v) *Powell v. United States*, No. 19 CIV. 11351 (AKH), 2022 WL 1645545, at *2 (S.D.N.Y. May 24, 2022); (vi) *Bull v. Howard*, No. 22-CV-766 (JLS), 2024 WL 1585762, at *1 (W.D.N.Y. Apr. 11, 2024);

and (vii) *Newkirk v. City of New York*, No. 21-CV-6635, 2024 WL 3966096, at *1 (E.D.N.Y. Aug. 28, 2024) to support the proposition that the Executive Order 202.8 acted as a toll, such that Plaintiffs' First Motion to Amend was timely. (*Id.* at 5-9.)

## THE LEGAL FRAMEWORK FOR MOTIONS TO AMEND GENERALLY

**\*8** Motions to amend pleadings are governed by Federal Rule of Civil Procedure 15(a). Pursuant to Fed. R. Civ. P. 15(a)(2), which provides that "[t]he court shall freely give leave when justice so requires." Generally, "[u]nless there is a showing of bad faith, undue delay, futility or undue prejudice to the non-moving parties, the district court should grant leave to amend." *Adlife Mktg. & Communs Co. v. Best Yet Mkt., Inc.*, No. 17-CV-02987 (ADS) (ARL), 2018 WL 4568801, at *1 (E.D.N.Y. Sept. 24, 2018) (citing *Forman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

The party opposing the proposed amended pleading has the burden of establishing that the amendment would be prejudicial or futile. *Jipeng Du v. Wan Sang Chow*, No. 18-CV-01692 (ADS) (AKT), 2019 WL 3767536, at *4 (E.D.N.Y. Aug. 9, 2019) (internal quotations and citations omitted). The movant must submit the proposed amended pleading to the motion, as was done here, specifying the new claims and/or parties intended to be added. *See Nabatkhorian v. County of Nassau*, No. 12-CV-1118 (JS) (GRB), 2012 WL 13113646, at *1 (E.D.N.Y. Aug. 9, 2012).

The Second Circuit clarified the standard to be applied by the District Courts in considering motions for leave to amend dependent upon the timing of the proposed amendment:

> The ability of a plaintiff to amend the complaint is governed by Rules 15 and 16 of the Federal Rules of Civil Procedure which, when read together, set forth three standards for amending pleadings that depend on when the amendment is sought. At the outset of the litigation, a plaintiff may freely amend her pleadings pursuant to Rule 15(a)(1) as of right without court permission. After that period ends—either upon expiration of a specified period in a scheduling order or upon expiration of the default period set forth in Rule 15(a)(1)(A)—the plaintiff must move the court for leave to amend, but the court should grant such leave "freely ... when justice so requires" pursuant to Rule 15(a)(2). This is a "liberal" and "permissive" standard, and the only "grounds on which denial of leave to amend has long been held proper" are upon a showing of "undue delay, bad faith, dilatory motive, [or] futility." The period of "liberal" amendment ends if the district court issues a scheduling order setting a date after which no amendment will be permitted. It is still possible for the plaintiff to amend the complaint after such a deadline, but the plaintiff may do so only up [to] a showing of the "good cause" that is required to modify a scheduling order under Rule 16(b)(4).

*Sacerdote v. NYU*, 9 F.4th 95, 115 (2d Cir. 2021); *Johnson v. Barnett Outdoors, LLC*, No. 21-CV-6311 (MJP), 2023 U.S. Dist. LEXIS 208011, at *4, 2023 WL 8050236 (W.D.N.Y. Nov. 20, 2023) (stating that Rule 15(a)'s standard must be balanced with Rule 16(b)'s good cause standard).

To this end, under Rule 16(b), "good cause" is required to modify a scheduling order like the Scheduling Order set by the previously assigned Magistrate Judge in the instant case. *See* ECF No. 10 (setting the deadline for motions to join new parties or amend the pleadings as June 26, 2020); Fed. R. Civ. P. 16(b)(4); *Sacerdote*, 9 F.4th at 115 ("[T]he period of 'liberal' amendment ends if the district court issues a scheduling order setting a date after which no amendment will be permitted. It is still possible for the plaintiff to amend the complaint after such a deadline, but the plaintiff may do so only up a showing of the 'good cause' that is required to modify a scheduling order under Rule 16(b)(4)"). "[A] finding of 'good cause' depends on the diligence of the moving party." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000); *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 282 F.R.D. 76, 79 (S.D.N.Y. 2012) ("The Rule 16(b)(4) 'good cause' inquiry is primarily focused upon the diligence of the movant in attempting to comply with the existing scheduling order and the reasons advanced as justifying that order's amendment. The burden of demonstrating good cause rests with the movant.").

**\*9** It is under this legal framework that the undersigned analyzes the instant application to amend.

### DISCUSSION

Plaintiffs' Second Motion to Amend seeks to substitute Office Santanello for the "John Doe" defendant, and as articulated in the M&O, " 'John Doe' substitutions 'may only be accomplished when all of the specifications of Fed. R. Civ. P. 15(c) are met.' " *Miehle-Kellogg*, No. 19-CV-4943(GRB)(JMW), 2023 WL 2632452, at *5 (quoting *Hogan*, 738 F.3d at 517). "[W]here the state law regarding relation back is more generous than the federal law, [however,] the state law will be applied. [N.Y. CPLR § 1024] provides a 'more forgiving principle of relation back' for cases involving John Doe defendants and will therefore be applied.' " *Id.* at *6 (quoting *Hogan*, 738 F.3d at 518). For the reasons stated, the undersigned finds Plaintiffs' proposed amendment to add Officer Santanello as a named defendant in place of John Doe is permitted under Rule 15(c)(1)(A) and N.Y. CPLR § 1024.

Rule 15(c) provides, in relevant part:

> An amendment to a pleading relates back to the date of the original pleading when: (A) the law that provides the applicable statute of limitations allows relation back; (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading; or (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment: (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15 (c)(1)(A)-(C)(i)-(ii) (emphasis added).

Relevant here, under Rule 15(c)(1)(A), an amended pleading may relate back to an earlier-filed complaint when "the law that provides the applicable statute of limitations allows relation back." Fed. R. Civ. P. 15 (c)(1)(A). "New York state law provides the three-year statute of limitations applicable to § 1983 claim[s]," and "[t]he incident leading to [Mr. Kellogg's] death occurred on December 15, 2018, meaning the statute of limitations [and the time limit for substitution] expired on December 15, 2021[,]" and, therefore, under normal circumstances, Plaintiffs' First *and* Second Motions to Amend would have been untimely under Rule 15(c)(1)(A). *Miehle-Kellogg*, No. 19-CV-4943(GRB)(JMW), 2023 WL 2632452, at *6 (citing *Montague v. City of Rochester*, No. 21-1598-pr, 2022 WL 16558154, at *1 (2d Cir. 2022)); *Rothman v. Gregor*, 220 F.3d 81, 96 (2d Cir. 2000) ("[w]hen a plaintiff seeks to add a new defendant in an existing action, the date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes."). However, the undersigned finds tolling under Executive Order 202.8 applies here and renders Plaintiffs' first request to amend – made on January 31, 2022 – timely.

**\*10**  In general, federal courts "apply the New York rule for tolling that statute of limitations." *Bd. of Regents of the Univ. of the State of N.Y. v. Tomanio*, 446 U.S. 478, 483, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980); *Pearl v. City of Long Beach*, 296 F.3d 76, 81 (2d Cir. 2002) (internal citations omitted) ("Because the Supreme Court wanted section 1983 actions to be subject to state tolling rules, it seems likely that both statutory and common law rules are to be borrowed."). "However, the Court is not to apply the state tolling rule if it would 'defeat the goals' of Section 1983." *Bonilla v. City of New York*, No. 20CV1704RJDLB, 2020 WL 6637214, at *2–3 (E.D.N.Y. Nov. 12, 2020) (quoting *Abbas v. Dixon*, 480 F.3d 636, 641 (2d Cir. 2007)).

The COVID-19 pandemic temporarily paralyzed courts and court proceedings. "On March 7, 2020, Governor Cuomo issued Executive Order 202.8 declaring that, '[i]n accordance with the directive ... to limit court operations to essential matters during the pendency of the COVID-19 health crisis, any specific time limit for the commencement ... of any legal action ... is hereby tolled from the date of this executive order until April 19, 2020.' " *Uzoigwe v. Charter Commc'ns, LLC*, No. 23 CV 7383 (HG) (LB), 2024 WL 1311525, at *4 (E.D.N.Y. Mar. 18, 2024), *report and recommendation adopted*, No. 23CV07383HGLB, 2024

WL 1756503 (E.D.N.Y. Apr. 24, 2024) (quoting New York State Executive Order 202.8). "This EO was extended by 'a series of nine subsequent [EOs],' with the last extension ending on November 3, 2020, for a total period of 228 days." *Id.* (quoting *Barry v. Royal Air Maroc*, No. 21-CV-8481, 2022 WL 3215050, at \*4 (S.D.N.Y. July 8, 2022), *report and recommendation adopted*, No. 21-CV-8481, 2022 WL 3214928 (S.D.N.Y. Aug. 9, 2022)).

"As a threshold matter, Executive Order 202.8 does not defeat the goals of Section 1983 ... [r]ather, it advances the goals of 'deterrence and compensation' by permitting Plaintiff[s] ample time to pursue [their] claims during a global pandemic." *Bonilla*, No. 20CV1704RJDLB, 2020 WL 6637214, at \*2–3 (quoting *Abbas*, 480 F.3d at 641) (holding that Magistrate Judge Bloom's decision to rely on the "State's wisdom in setting a limit, and exceptions thereto, on the prosecution of a closely analogous claim" in applying the executive order to Plaintiff's Section 1983 claims was not clearly erroneous or contrary to law). Accordingly, "[t]here is no question that the state's 'procedural laws' governing tolling are 'tolling rules' that should be 'borrowed' " here. *Id.* at \*3 (quoting *Pearl*, 296 F.3d at 81.)

"Ambiguity [once] exist[ed] regarding the effect of [ ] Executive Order" 202.8 – specifically, as to whether it *tolled* or *suspended* the applicable statute of limitations. *Bonilla v. City of New York*, No. 20 CV 1704 (RJD)(LB), 2020 WL 6686531, at \*2 (E.D.N.Y. Oct. 3, 2020), *aff'd*, No. 20CV1704RJDLB, 2020 WL 6637214 (E.D.N.Y. Nov. 12, 2020). [4] However, "[t]he overwhelming number of cases in this Circuit have applied New York Executive Order 202.8 to toll claims," including those brought under 42 U.S.C. § 1983. *See Newkirk v. City of New York*, No. 21-CV-6635, 2024 WL 3966096, at \*1 (E.D.N.Y. Aug. 28, 2024) (Cogan, J.). Indeed, the New York Court of Appeals recently affirmed that construction. *See Favourite Ltd. v. Cico*, 42 N.Y.3d 250, 243 N.E.3d 494, 502 (N.Y. 2024) (emphasis added) ("Executive Order 202.8 *tolled* all filing periods until November 3, 2020."); *Jaime v. City of New York*, 41 N.Y.3d 531, 237 N.E.3d 796, 801 (N.Y. 2024) (202.8 tolled all limitations periods due to the COVID-19 pandemic); *see also McKinnies v. City of New York*, No. 23-CV-2567 (HG) (JRC), 2024 WL 4333703, at \*4 (E.D.N.Y. Sept. 27, 2024) (quoting *Bonilla*, No. 20-cv-1704, 2020 WL 6637214, at \*2) ("[C]ourts in this Circuit have found that the COVID-19 executive orders do apply to claims arising under Section 1983 because the executive orders do not 'defeat the goals' of Section 1983, but rather 'advance[ ] the goals of deterrence and compensation by permitting [a] [p]laintiff ample time to pursue [her] claims during a global pandemic.' "); *In re Nordlicht*, 115 F.4th 90, 113 (2d Cir. 2024) (emphasis added) ("Executive Order 202.8 *tolled* any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding."); *Charles Equip. Energy Sys., LLC v. INNIO Waukesha Gas Engines, Inc.*, No. 22 CIV. 2716 (CM), 2023 WL 2346337, at \*1 (S.D.N.Y. Mar. 3, 2023) (emphasis added) ("[I]n light of the COVID pandemic, Governor Cuomo had issued Executive Order 202.8, which *tolled* the statute of limitation for the filing of any claim brought under New York law (including the claims in suit) during the period March 20, 2020 through November 3, 2020. This added a total of 228 days to the otherwise applicable [statute of] limitations period"); *Bell v. Saunders*, No. 920CV00256BKSTWD, 2022 WL 2064872, at \*5 (N.D.N.Y. June 8, 2022) ("District courts in this Circuit have agreed and found that Executive Order 202.8 and subsequent orders tolled the statute of limitations period from March 20, 2020 through November 3, 2020, a total of 228 days.").

**\*11**  To this end, the Court finds Executive Order 202.8 tolled the applicable statute of limitations here as follows:

| | |
|---|---|
| *Date of the Incident*: | December 15, 2018 |
| *Statute of Limitations Expiration Date*: | December 15, 2021 |
| *Statute of Limitations Expiration Date Applying 228-Day Tolling Period Under 202.8*: | July 31, 2022 |

Therefore, applying the tolling as required under 202.8, Plaintiffs' first request to amend made on January 31, 2022, was timely. [5] *See e.g., Harris v. City of New York*, No. 22-CV-1763 (JGLC), 2024 WL 4335662, at \*5 (S.D.N.Y. Sept. 27, 2024) ("Executive Order issued during the COVID-19 pandemic tolled the applicable statute of limitations for 228 days. Thus, the expiration of the statute of limitation[s] [was] extended from December 6, 2021 to July 22, 2022."); *Liverpool v. City of New York*, No. 20-CV-4664 (ER), 2023 WL 7723165, at \*8 (S.D.N.Y. Nov. 15, 2023) (applying tolling under 202.8, finding "a

statute of limitations that expired on September 6, 2021, would extend to April 23, 2022"); *Newkirk*, No. 21-CV-6635, 2024 WL 3966096, at *1 (applying 202.8, extending December 11, 2021 statute of limitations deadline to April 1, 2022); *Bull v. Howard*, No. 22-CV-766 (JLS), 2024 WL 1585762, at *1 (W.D.N.Y. Apr. 11, 2024) (while the limitations period applicable to Plaintiff's claims would have elapsed on April 12, 2022, the tolling from March 20, 2020 to November 4, 2020 pursuant to the COVID-19 Executive Orders extended the April 12, 2022 deadline to November 27, 2022).

In support of their position that Plaintiffs' first request for leave to amend was untimely, Defendants primarily rely on this Court's June 23, 2023 decision in *Loeb v. Cnty. of Suffolk*, which held that Executive Order 202.8 *suspended* – but did not *toll* – the statute of limitations in a Section 1983 action. No. 22-CV-6410 (HG), 2023 WL 4163117, at *2-3 (E.D.N.Y. June 23, 2023) ("Executive Order 202.8 was issued in part to preserve litigants' rights during the COVID-19 pandemic, which presented extraordinary difficulties for, among other things, filing, obtaining counsel, and utilizing court services such as *pro se* offices. Interpreting Executive Order 202.8 as a toll rather than a suspension is contrary to the spirit of the Executive Order."). In reaching this conclusion, *Loeb* relied on two New York state court decisions – *Baker* and *Cruz v. Guaba,* 74 Misc. 3d 1207(A), 159 N.Y.S.3d 828 (N.Y. Sup. Ct. 2022), *rev'd*, 226 A.D.3d 964, 210 N.Y.S.3d 425 (2024) ("*Cruz*"), which held that Executive Order 202.8 "did not toll all statutes of limitations, but only suspended them, due to the COVID-19 Pandemic." *Baker*, 74 Misc. 3d at 383–84. However, since *Loeb* was decided, the Appellate Division has recently reversed both decisions to clarify that 202.8 did in fact *toll* the applicable statute of limitations period. *See Cruz v. Guaba,* 210 N.Y.S.3d 425, 426, 226 A.D.3d 964 (N.Y. App. Div. 2d Dep't 2024) ("In March 2020, at the time the tolling provision of then Governor Cuomo's executive orders went into effect, the plaintiff had approximately 10 months remaining on the three-year limitations period to commence this action. This remaining period started to run after the toll was lifted on November 4, 2020, and the plaintiff [timely] commenced this action approximately 6 months later."); *Baker v. 40 Wall St. Holdings Corp.*, 208 N.Y.S.3d 680, 681, 226 A.D.3d 637 (N.Y. App. Div. 2d Dep't 2024) (internal citations omitted) ("[D]ue to the tolling provision of the executive orders, the statute of limitations within which the plaintiff was required to commence this action was tolled between March 20, 2020, and November 3, 2020, a period of 228 days. Thus, this action, which was commenced against [defendant] on July 29, 2021, was commenced against that defendant within the statute of limitations."). [6]

**\*12** Accordingly, applying Executive Order 202.8 as interpreted by the majority of courts in this Circuit and now New York's highest court, the Court finds the statute of limitations period for Plaintiffs' § 1983 claims was tolled for 228 days, and the period therefore expired on July 31, 2022, such that Plaintiffs' first request to amend made on January 31, 2022, was timely. *See V.S. Muhammad*, 595 F.3d 426, 432 (2d Cir. 2010) (this Court is "bound to apply the law as interpreted by .... the state's highest court"). Plaintiffs' proposed amendment to substitute Officer Santanello at this stage is therefore permitted under Rule 15(c)(1)(A).

Likewise, the Court finds amendment is permitted under Section 1024 of the CPLR, which "provide[s] a special amendment procedure for claims alleged against John Doe defendants[:]"

> A party who is ignorant, in whole or in part, of the name or identity of a person who may properly be made a party, may proceed against such person as an unknown party by designating so much of his name and identity as is known. If the name or remainder of the name becomes known all subsequent proceedings shall be taken under the true name and all prior proceedings shall be deemed amended accordingly.

*Miehle-Kellogg*, No. 19-CV-4943(GRB)(JMW), 2023 WL 2632452, at *6 (citing N.Y. CPLR § 1024).

Because Plaintiffs first requested to amend the complaint to substitute Officer Santanello on January 31, 2022, well before the statute of limitations deadline of July 31, 2022, as tolled by Executive Order 202.8, the Court finds Plaintiffs have " 'exercise[d] due diligence, *prior to the statute of limitations*, to identity the defendant by name.' " *Id.* (quoting *Hogan*, 738 F.3d at 519) (emphasis added); *see also Barrett v. City of Newburgh*, 720 F. App'x 29, 33 (2d Cir. 2017) ("Section 1024's 'due diligence' requirement is not forgiving. The onus of identifying an officer defendant's name, or at least making a good faith effort, lies on

the plaintiff."); *see e.g.*, *Bell*, No. 920CV00256BKSTWD, 2022 WL 2064872, at *5 ("[B]ecause Plaintiff filed his motion to amend (attaching a proposed amended complaint naming Christopher Winchell as a defendant) before the statute of limitations period, as tolled by the Executive Orders, expired, Defendant's motion to dismiss Plaintiff's claims on statute of limitations grounds is denied"). [7]

## CONCLUSION

**\*13**  For the reasons stated herein, Plaintiffs' Motion to Amend the Complaint (ECF No. 47) is **GRANTED**. Plaintiffs are directed to file their Amended Complaint substituting Officer Santanello for Defendant "John Doe" on or before December 20, 2024.

## All Citations

Slip Copy, 2024 WL 5120017

---

## Footnotes

1    "While the Second Circuit has suggested in dicta and non-precedential opinions that a motion to amend is non-dispositive, it has yet to explicitly hold so. Thus, lower courts within this Circuit have taken two approaches when deciding motions to amend: some treat the motion as wholly non-dispositive, reviewable only for clear error, others treat the motion as dispositive if denying and non-dispositive if granting." *Covet & Mane, LLC v. Invisible Bead Extensions, LLC*, No. 21CIV7740 (JPC)(RWL), 2023 WL 6066168, at *5 (S.D.N.Y. Sept. 18, 2023) (internal citations omitted) (cleaned up). *See e.g., Pusepa v. Annucci*, No. 17-CV-7954 (RA) (OTW), 2024 WL 4579450, at *1 (S.D.N.Y. Oct. 25, 2024) ("A magistrate judge's denial of a motion to amend a complaint should be treated as dispositive, while a grant of the same motion should be treated as non-dispositive."); *Portelos v. City of New York*, No. 12 Civ. 3141 (RRM) (VMS), 2015 WL 5475494, at *1 (E.D.N.Y. Sept. 15, 2015) ("[D]istrict courts in this circuit have generally found that denial of a motion to amend is dispositive, whereas granting a motion to amend is non-dispositive."). Accordingly, because the Court is denying Plaintiffs' Second Motion to Amend, the undersigned proceeds by Memorandum and Order rather than by Report and Recommendation.

2    Rule 15(c)(1)(C) provides that: "[a]n amendment to a pleading relates back to the date of the original pleading when ... the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."

3    The Court additionally rejected Plaintiffs' reliance on Rule 17(d) as grounds to amend: "Plaintiffs' invocation of Rule 17(d) similarly fails. Rule 17(d) provides that 'public officer who sues or is sued *in an official capacity* may be designated by official title rather than by name, but the court may order that the officer's name be added.' Thus, this section is inapplicable as to the claims asserted against Officer Santanello in his individual capacity. Therefore, any claims plaintiffs may have had against Officer Santanello in his individual capacity remain time barred. Assuming *arguendo* that plaintiffs are correct that the officer's name could be added as to the claims against him *in his official capacity*, the amendment would nonetheless be futile as the County is named in the complaint, rendering any 'official capacity' claims against Officer Santanello redundant." *Id.* at *7 (Fed. R. Civ. P. 17) (emphasis added).

4      "A 'toll' of a statute of limitations for any reason ... stops the clock of the statute of limitations from ticking. The time that the limitations period is tolled for [such reason] is added to the calendar computation once the toll is lifted." Hon. Mark C. Dillon, *An Overview of Tolls of Statutes of Limitations on Account of War: Are They Current and Relevant in the Post-September 11th Era?*, 13 N.Y.U. J. Legis. & Pub. Pol'y 315, 354 (2010). For example, "if a statute of limitations is tolled for 365 days, the action or proceeding can be commenced one year after the limitations period would have expired had there been no toll." *Id.* "By contrast, a 'suspension' of the statute of limitations simply extends the expiration date of the limitations period to a later defined date on the calendar." *Id.* For example, "[i]f a statute of limitations is suspended for 365 days, the time for commencing an action expires at the end of the suspension, without re-starting the statute of limitations clock at the end of that period." *Id.* "Here, if there was a toll, the period from the Governor's first order on March 20, 2020, to his last order on November 3, 2020, [*i.e.*, 228 days] would be added to the statute of limitations for every person with a claim who had not filed suit by March 20, 2020, and would also be added to every type of litigation deadline that arose during the suspension period." *Baker v. 40 Wall St. Holdings Corp.*, 74 Misc. 3d 381, 383–84, 161 N.Y.S.3d 723, 725 (N.Y. Sup. Ct. 2022), *rev'd*, 226 A.D.3d 637, 208 N.Y.S.3d 680 (2024) ("*Baker*"). "With a suspension, a party can only benefit from the Executive Orders if his or her statute of limitations or filing deadline fell within the suspension period." *Id.*

5      Plaintiffs did not raise the issue of whether Executive Order 202.8 tolled the applicable statute of limitations here in their First Motion to Amend, and therefore, this Court applied December 15, 2021 as the applicable statute of limitations in finding that Plaintiff's First Motion to Amend was untimely. *See* ECF Nos. 29, 32. Since then, the New York Court of Appeals has clarified and confirmed that 202.8 operates as a toll.

6      Similar to the instant case, Baker's applicable statute of limitations period of three years started to run March 1, 2018. *Id.* at 680. On July 29, 2021, Baker filed a second supplemental summons and second amended complaint, adding Star–Delta as a defendant. *Id.* at 681. Star–Delta moved to dismiss the second amended complaint "insofar as asserted against it as time-barred, contending that the action was not timely commenced against it within the applicable three-year statute of limitations." *Id.* In finding that Baker's July 29, 2021 addition of Star–Delta was timely, the Appellate Division further noted: "[c]ontrary to Star–Delta's contention, this toll of the statute of limitations did not only apply to statutes of limitations that expired between March 20, 2020, and November 3, 2020." *Id.*

7      "Even when a claim would otherwise be timely, a Court still has the discretion to deny leave to amend a complaint when there has been bad faith, undue delay, or undue prejudice to the opposing party. In the Second Circuit, the practice is to allow a party to amend a pleading in the absence of a showing by the nonmovant of prejudice or bad faith." *Bonilla*, No. 20 CV 1704 (RJD)(LB), 2020 WL 6686531, at *3 (internal citations omitted) (cleaned up). Here, the Court finds there has been "no bad faith or undue delay on [Plaintiffs'] part" and Defendants "have suffered no prejudice from the delay." *Id.* "With respect to 'undue prejudice,' courts consider whether amendment would: '(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction.' " *Alicea v. City of New York*, No. 1:16-CV-07347 (JLR), 2023 WL 3724131, at *3 (S.D.N.Y. May 30, 2023) (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)). Although briefly raised for the first time at Oral Argument, Defendants do not sufficiently establish "any prejudice by the granting of [Plaintiffs'] motion." *Bonilla*, No. 20CV1704 (RJD)(LB), 2020 WL 6637214, at *3; ECF Nos. 48, 50.

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    12

2021 WL 8344133
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

ONE STOP 34, LLC, Plaintiff,

v.

STIMDEL PROPERTIES (FL), INC., Defendant.

19-CV-04011 (LDH) (PK)
|
Signed 09/04/2021

**Attorneys and Law Firms**

Andrew L. Crabtree, Melville, NY, Kevin M. Shelley, Kaufmann, Gildin, & Robbins LLP, New York, NY, for Plaintiff.

William M. Brodsky, Jami Lisa Mevorah, Fox Horan & Camerini LLP, New York, NY, for Defendant.

## REPORT & RECOMMENDATION

Peggy Kuo, United States Magistrate Judge:

**\*1** One Stop 34, LLC ("Plaintiff" or "One Stop") brought this declaratory judgment and breach of contract action against Stimdel Properties (FL), Inc. ("Defendant" or "Stimdel"). (Compl., Dkt. 1.) The Complaint seeks a declaratory judgment construing a lease provision and damages for breach of contract in performance of the lease. (*See* Compl.) Defendant filed an answer, asserting affirmative defenses and counterclaims for damages for breach of contract and declaratory judgments. (Amended Answer, Dkt. 16.) Both parties seek attorneys' fees and costs. (Compl. at 8; Amended Answer at 15-16.)

Defendant filed a Motion for Partial Summary Judgment (the "Motion," Dkt. 46.) The Honorable LaShann DeArcy Hall referred the Motion to the undersigned for a report and recommendation.

For the reasons below, the undersigned respectfully recommends that the Motion be granted in part and denied in part.

## BACKGROUND

### I. Factual Background

Unless otherwise stated, the following facts are taken from Defendant's Rule 56.1 Statement ("Def. 56.1," Dkt. 29-8), Plaintiff's Response to Defendant's Rule 56.1 Statement ("Pl. Response 56.1," Dkt. 38), the Exhibits attached to the Motion (Dkt. 47), and the Exhibits attached to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Partial Summary Judgment ("Pl. Opp.," Dkt. 48).

### A. The Lease and the Demised Premises

The material facts are largely undisputed. Plaintiff is a New York limited liability company, and Defendant is a Florida corporation. (Def. 56.1 ¶¶ 1-2; Pl. Response 56.1 ¶¶ 1-2.) On December 15, 2017, Plaintiff signed an agreement to lease a property in Queens, New York from Defendant. (Def. 56.1 ¶ 3; Pl. Response ¶ 3; the "Lease," Ex. F to the Motion, Dkt. 47-7.) The Lease describes the leased property as:

One Stop 34, LLC v. Stimdel Properties (FL), Inc., Not Reported in Fed. Supp. (2021)

Case 1:25-cv-00341-LEK-MJK    Document 3    Filed 03/28/25    Page 42 of 62

that certain building known as 12-01 34th Avenue, Long Island City, Queens County, New York,
containing approximately 63,000 rentable square feet of space (the "Building") and the land on which
the Building sits, identified as Block 522, Lots 1 and 21...

(Lease at PL000000001.) The Building and the land are together referred to as the "Demised Premises." (*Id.*) An attachment
to the Lease more particularly describes the Demised Premises as running along 34th Avenue (Graham Avenue) between 12th
Street (Sherman Street) and 13th Street and extending north along 12th Street and 13th Street 345.81 feet, with a line connecting
the corners of the property on 12th Street and 13th Street. (Ex. A to the Lease, Dkt. 47-7 at PL000000035.)

A survey attached to the Motion shows the Demised Premises as consisting of the Building and an area outside the building
to its north. (*See* Ex. G to the Motion, "Survey," Dkt. 47-8.)



*The Survey.*

The outdoor area spans the length of the block between 12th Street and 13th Street and is separated from the sidewalk on
both streets by a closed fence. (*Id.*) It has four marked parking spaces and several loading docks. (*Id.*) The Lease makes no
mention of any parking spaces or loading docks. (*See* Lease.) A brochure for the Demised Premises and the Adjoining Property
which was "created by Stimdel's real estate broker, Avison Young" (Pl. Opp. at 6) described the Demised Premises as "a one
(1) story older mill-constructed, fully sprinklered warehouse and storage facility, totaling 63,000-square feet," which included
"Off-street loading and parking." (Ex. 1 to the Declaration of Daniel Gildin, "Gildin Decl.," Dkt. 48-3 at 3.) The brochure was
not incorporated into or referenced in the Lease.

 **\*2**  The Lease includes several provisions concerning the use of the Demised Premises. Section 3.1 notes that "the Demised
Premises are leased to [Plaintiff] for subdivision into smaller units to be used by [Plaintiff]'s licensees." (Lease § 3.1.) Similarly,
the Lease notes, "it is agreed that [Plaintiff]'s business is to license the use of space within the Demised Premises to one or
more entities." (*Id.* § 10.11.) Section 1.4(d) gives Plaintiff "the right to peacefully and quietly have, hold, occupy and enjoy
the Demised Premises, subject to the terms of the Lease without any hindrance or molestation from Landlord or any person
claiming by, from or under Landlord." (*Id.* § 1.4(d).) The Lease gives Plaintiff "exclusive control and possession of the Demised
Premises," and Defendant "shall have no liabilities, obligations or responsibilities whatsoever with respect thereto accept [sic]

Case 1:25-cv-00341-LEK-MJK    Document 3    Filed 03/28/25    Page 43 of 62

One Stop 34, LLC v. Stimdel Properties (FL), Inc., Not Reported in Fed. Supp. (2021)

as expressly set forth herein." (*Id.* § 7.6.) Plaintiff agreed that it had "inspected the Demised Premises and accepts the same on the date hereof, subject to the representations, warranties and covenants of Landlord in this Lease." (*Id.* § 7.1.)

Section 15.1 of the Lease states, in part, "This Lease may not be changed or terminated orally." (*Id.* § 15.1.) There is also a merger clause that states, "This lease and the Schedules annexed hereto constitute the entire agreement between [Defendant] and [Plaintiff] referable to the Demised Premises, and all prior negotiations and agreements are merged herein." (*Id.* § 15.5.) The "Lease may be amended only in writing, signed by both [Defendant] and [Plaintiff]." (*Id.* § 20.7.)

The Lease is governed by New York law. (*Id.* at §§ 19.2, 20.8.) In any action to enforce its terms, the Lease provides for reasonable attorneys' fees, expert's fees, related expenses, and costs to a prevailing party. (*Id.* at § 19.3.)

Finally, "[t]he language in all parts of this Lease shall in all cases be construed as a whole according to its fair meaning and neither strictly for nor against [Defendant] and [Plaintiff]." (*Id.* § 20.4.)

The Lease neither provides for nor prohibits consequential damages in case of breach. (Def. 56.1 ¶ 14; Pl. Response 56.1 ¶ 14.)

### B. The Adjoining Property

Adjacent to the Demised Premises is Lot 29 of Block 522 of the Queens County Tax Map. (the "Adjoining Property" or the "Adjoining Premises," Def. 56.1 ¶ 15; Pl. Response 56.1 ¶ 15; *see also* Compl. ¶ 13.) The Adjoining Property consists of a building and an outside area with fourteen marked parking spaces. (*See* Survey.) The boundary between the Demised Premises and the Adjoining Property is marked by a yellow dividing line between the two outside areas. (*See* Ex. 4 to Gildin Decl., Dkt. 48-7 at D003655-3656; Ex. 5 to Gildin Decl., Dkt. 48-8 at PL000000148.) The two properties do not overlap. (Def. 56.1 ¶ 17 ("No portion of the Adjoining Property is a part of the Demised Premises"); Pl. Response 56.1 ¶ 17) The Lease's description of the Demised Premises does not include the Adjoining Property. (Def. 56.1 ¶ 16; Pl. Response 56.1 ¶ 16.)

Defendant also owns the Adjoining Property and leased it to DHL Express (USA), Inc. ("DHL"). (Deposition of Alejandro Onofrio, "Onofrio Depo.," Dkt. 47-17 at 15:18-16:9.) Pursuant to the written lease with DHL, Defendant was to provide 35 parking spaces on the Adjoining Property. (*See* Ex. 4 to the Gildin Decl. at D003651.)

A brochure for the Demised Premises and the Adjoining Property describes the properties as "separated by a street-to-street shared loading area and parking lot." (Ex. 1 to Gildin Decl. at 3.)

### C. The Disputed "Common Area"

Plaintiff describes as the "Common Area" a strip of land "approximately 30 feet wide by 200 feet long, at each end of which is a driveway and gate through which vehicles, including large buses and trucks, enter the Demised Premises and the Adjoining Property." (Compl. ¶ 13.) Based on this description and the dimensions indicated on the Survey, the Common Area would extend from the gate on 12th Street to the gate on 13th Street for the width of the open gate on 12th Street. (*See* Survey.) This "Common Area," despite Plaintiff's description, is located entirely on the Adjoining Property. (*See* Pl. Opp. at 10 ("The term Demised Premises ... does not include the Common Area.")) The Lease makes no mention of the "Common Area," or of any common area that Plaintiff could use pursuant to the Lease that was outside the Demised Premises.

**\*3**  Plaintiff contends that "[t]he only access to the Demised Premises requires travelling through the fence gates and Common Area (outside of the Demised Premises) ..." (*See* Pl. Opp. at 2.) However, there appear to be several access points from the street to the Building on the Demised Premises, including one access point on 12th Street, access points on 13th Street, and one access point on 34th Avenue. (*See* Survey; *see also* Pl. Opp. at 11 (admitting that there is access to the Building).) Alejandro Onofrio, the Vice President of Administration and Finance for Defendant and Ocasa (a sister company to Defendant), testified at his deposition that "small vehicles" and "reasonable size small trucks" may have been able to access the outside area of the Demised Premises by driving through the Building. (Onofrio Depo. at 69:8-73:18.)

Case 1:25-cv-00341-LEK-MJK    Document 3    Filed 03/28/25    Page 44 of 62

One Stop 34, LLC v. Stimdel Properties (FL), Inc., Not Reported in Fed. Supp. (2021)

Nevertheless, for some time after the parties signed the Lease, Plaintiff and its licensees were permitted to access the parking and loading area of the Demised Premises through the gates on the Adjoining Property. Onofrio testified, "My understanding is that One Stop has the right to access this property through the gates and then access their side of the property that they rented" and that "One Stop had the right to access the property from both gates." (*Id.* at 27:16-19, 29:18-20.) DHL employees also believed that Plaintiff could use the gates and area on the Adjoining Property to enter and exit the Demised Premises. In an email, one such DHL employee sought to work with Defendant to ensure that new parking spots planned for the Adjoining Property "are not blocking or preventing [O]ne [S]top from going in and out of their building[.]" (Ex. 4 to the Gildin Decl. at D003655.) Internally, another DHL employee expressed concern that "[i]f I park where they say we should have 5 extra spots. I will be blocking everyone on the other side in and it w[ould] cause issues." (*Id.* at D003654.)

In early 2019, issues arose regarding the use of the parking areas by Plaintiff and DHL. On February 7, 2019, Peter Rivas of Ocasa wrote to Plaintiff's CFO and In-House Counsel Douglas Bauer asking Plaintiff to change its parking configuration to avoid being blocked in by DHL's parked vehicles. (Ex. 3 to the Gildin Decl., Dkt. 48-6 at PL000000129.) In response, Bauer asked,

> Is DHL claiming that they have the right to the entire yard except for the yellow lined area? That cannot be true as the middle section (extending from the gate) is for use by us and DHL for ingress and egress. I believe that they know this ...

(*Id.* at PL000000129.) Rivas replied that DHL is "aware that this is a common area and should not block the ingress or egress from gates to your side." (*Id.* at PL000000128.)

On February 27, 2019, Bauer reported to Rivas that "[a]ll is quiet between DHL and us so I believe it is safe to assume that this issue has been dealt with." (Ex. 5 to the Gildin Decl. at PL000000150.) However, on February 28, 2021, Rivas wrote to Bauer,

> I believe there is a misunderstanding the way the common area in the parking lot was determined[.] [Onofrio] just confirmed to me that the entire parking space was split with the yellow lined, so that both tenant have their parking area in the best possible way[.] It is like as a fence placed in between.

(Ex. 5 to the Gildin Decl. at PL000000148 (grammatical and spelling errors in the original).)

On March 28, 2019, Defendant informed Plaintiff that it "was not authorized to continue to access the Demised Premises" via the Common Area. (Compl. ¶ 15.) At least as of April 24, 2019, Defendant "had allowed ... DHL[ ] to park in the Common Area, thus partially blocking ingress and egress from the Demised Premises," including the gate on 13th Street. (*Id.* ¶¶ 19, 20.)

### D. The Sewage Leak

In or about March 2018, a sewage waste pipe on the Demised Premises ruptured and leaked (the "Sewage Leak"). (Def. 56.1 ¶ 19; Pl. Response 56.1 ¶ 19.) Plaintiff arranged for repairs associated with the Sewage Leak and demanded reimbursement from Defendant for the costs of those repairs. (Def. 56.1 ¶¶ 20-21; Pl. Response 56.1 ¶¶ 20-21.)

**\*4** On February 7, 2019, Plaintiff emailed Defendant requesting $27,722.53 as reimbursement for out-of-pocket costs associated with repairing the Sewage Leak. (Ex. J to Def. Mot., Dkt. 47-11 at D000614.) Plaintiff added,

Case 1:25-cv-00341-LEK-MJK    Document 3    Filed 03/28/25    Page 45 of 62

One Stop 34, LLC v. Stimdel Properties (FL), Inc., Not Reported in Fed. Supp. (2021)

> We had a myriad of other costs relating to [the Sewage Leak] as well (legal fees, having to give free rent, etc.). However, we have decided to eat those costs in the interests of our relationship so long as the amounts due us are settled as soon as possible

(*Id.* at D000614.) Over the next several days, the parties continued to negotiate the exact amount to be paid. On February 25, 2019, Defendant emailed Plaintiff, writing that Defendant's "investors approved to reduce all expense related to repairs and maintenance of sewer from rent[.] The total amount should be $57,745.04[.] This includes repairs sewer and what you have expensed on waste removal." (Ex. 5 to the Gildin Decl. at PL000000151.) The email included a revised rent calculation for March showing the credit of $57,745.04. (*Id.*) Plaintiff replied, "Agreed. We will pay the rent per below ... I am happy this situation is behind us." (*Id.* at PL000000150.)

There is no dispute that the rent credit was given and that the rent was paid.

### E. Other Repairs

The Complaint alleges that on April 11, 2019, Plaintiff "advised [Defendant] that the roof on the Building was leaking, causing damage to the interior of the Building and rendering portions of the Building uninhabitable," but Defendant initially failed to repair the roof leak. (Compl. ¶¶ 24-25.) The roof continued to leak and caused more damage. (*Id.* ¶ 26-27.) Plaintiff alleged that the roof leak and Sewage Leak caused "a number of One Stop's Licensees" to vacate the Building. (*Id.* ¶ 29.) Eventually, Defendant repaired the roof. (*Id.* ¶ 28.)

Plaintiff also alleges that it informed Defendant on March 29, 2019 of a crack in one of the Building's structural support beams. (*Id.* ¶ 30.) Some of Plaintiff's licensees "were required to evacuate a portion of the Building due to safety concerns," and Defendant failed to take immediate action to repair the beam. (*Id.* ¶¶ 31-33.) Plaintiff alleges that it "installed a temporary support beam in order [to] prevent a possible structural collapse of the building, at its own cost." (*Id.* ¶ 34.) Plaintiff retained a structural engineer to inspect the beam and issue a report documenting his findings, at a cost of $6,000, after which Defendant arranged its own inspection and "installed its own support for the beam." (*Id.* ¶¶ 35-36.) As of the date of the Complaint, Defendant had not "adequately" repaired the cracked beam. (*Id.* ¶ 36.) Plaintiff alleges that, because of the cracked support beam, Plaintiff and some of its licensees could not occupy parts of the Building, resulting in lost license fees and other consequential damages. (*Id.* ¶ 38.)

### II. Procedural Background

Plaintiff filed the Complaint on July 11, 2019, seeking a declaratory judgment "that it is entitled to access and use the Common Area for ingress and egress for itself and its Licensees" (Compl. ¶ 44), and damages for breach of contract related to Defendant's refusal to permit use of the Common Area, and for Defendant's failure to maintain and repair the roof, plumbing, and support beams (*Id.* ¶ 46). Plaintiff seeks damages, out-of-pocket costs and consequential damages, along with attorney's fees, expenses, and "such other and further relief ... to which it may be entitled." (*Id.* ¶ 48; *id.* at 8.)

**\*5**  Defendant answered the Complaint and asserted three counterclaims. (Amended Answer.) Defendant sought (1) breach of contract damages arising from various alleged violations of the Lease by Plaintiff, including "converting a loading dock located on the Demised Premises into parking spaces and subletting those parking spaces to sublessees," (2) declaratory judgment that Plaintiff and its licensees are not permitted to access or use the Adjoining Property, and (3) declaratory judgment that Defendant is not required to provide Plaintiff or its licensees access to the parking area through the Adjoining Property "because any inability to access the Parking Area by driving through the Building was caused entirely by Plaintiff's own modifications to the Building." (Amended Answer ¶¶ 61-103.) Defendant also seeks attorneys' fees, costs, and expenses. (*Id.* at 16.)

One Stop 34, LLC v. Stimdel Properties (FL), Inc., Not Reported in Fed. Supp. (2021)

Case 1:25-cv-00341-LEK-MJK    Document 3    Filed 03/28/25    Page 46 of 62

Plaintiff filed an answer to the counterclaims on October 3, 2019. (Dkt. 17.)

The parties engaged in and completed discovery. (Joint letter certifying close of discovery, Dkt. 36.) On January 28, 2021, Defendant filed the Motion (Dkt. 46-47), Plaintiff filed an Opposition (Dkt. 48), and Defendant filed a reply (Dkt. 49). The Motion seeks (1) dismissal of Plaintiff's declaratory judgment claim, (2) dismissal of Plaintiff's breach of contract claim arising from Defendant's refusal to allow access to the Demised Premises through the Adjoining Property, (3) dismissal of Plaintiff's claims for consequential and reputational damages, (4) dismissal of Plaintiff's claims for damages arising from the Sewage Leak, [1] (5) declaratory judgment that Plaintiff and its lessees are not entitled to access or use the Adjoining Property, and (6) reasonable attorneys' fees, disbursements, and costs. (Motion at 1-2.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Rule 56(a) states:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

"In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (quotations and citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48. A "dispute about a material fact is 'genuine,' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

"It is the movant's burden to show that no genuine factual dispute exists...." *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). Once the movant satisfies its burden, the party opposing summary judgment "must point to specific evidence in the record" demonstrating a genuine issue for trial and "cannot rest on allegations in the pleadings." *Id.* at 273.

Where contract interpretation is involved, "[t]he proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment." *Omni Quartz, Ltd. v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002).

## DISCUSSION

### I. Claims Regarding Access to the "Common Area"

 **\*6**  Three of Defendant's requests in the Motion relate to the issue of whether Plaintiff is entitled to use the "Common Area" on the Adjoining Property to access the Demised Premises: (1) its request that the Court dismiss Plaintiff's claim for declaratory judgment that Plaintiff and Plaintiff's licensees are permitted such use; (2) its request that the Court grant Defendant's counterclaim for declaratory judgment that Plaintiff and Plaintiff's licensees are not permitted such use; and (3) its request that the Court dismiss Plaintiff's claim for breach of contract for Defendant's refusal to permit such use. (Motion at 1-2.)

Case 1:25-cv-00341-LEK-MJK    Document 3    Filed 03/28/25    Page 47 of 62

One Stop 34, LLC v. Stimdel Properties (FL), Inc., Not Reported in Fed. Supp. (2021)

The parties do not dispute that the Lease covers only the Demised Premises and does not grant Plaintiff the right to use any part of the Adjoining Property, including the Common Area. (Pl. Opp. at 10 n. 2) ("[t]he Demised Premises includes a parking area, but does not include access to the fence gates or Common Area....") Plaintiff contends, however, that absent any provision describing access to the parking and loading area of the Demised Premises, the Lease is "ambiguous," and therefore extrinsic evidence of the parties' intent should be considered, raising a genuine dispute of material fact. (*Id.* at 11.)

### A. Contract Interpretation Under New York Law

There is no dispute that the Lease is governed by New York Law. (Lease §§ 19.2, 20.8; *see also* "Def. Mem. Of Law," Dkt. 47 at 8 n.4; Pl. Opp. at 2, 8, 17.)

"[T]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (N.Y. 2002). "The best evidence of what parties to a written agreement intend is what they say in their writing." *Id.* (citing *Slatt v. Slatt*, 64 N.Y.2d 966, 967 (N.Y. 1985)). "[W]hen parties set down their agreement in a clear, complete document, their writing should ... be enforced according to its terms." *S. Rd. Assocs., LLC v. Int'l Bus. Machines Corp.*, 4 N.Y.3d 272, 277 (N.Y. 2005) (quoting *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (N.Y. 2004) (alteration in *S. Rd. Assocs.*)).

In resolving a dispute about the meaning of a contract, a court can look outside the four corners of an agreement only if it is necessary to resolve an ambiguity in the language of the contract. *Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525, 527 (2d Cir. 1990). "Contract language is ambiguous if it is reasonably susceptible of more than one interpretation, and a court makes this determination by reference to the contract alone." *Id.* "A contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.' " *Greenfield*, 98 N.Y.2d at 569 (quoting *Breed v. Insurance Co. of N. Am.*, 46 N.Y.2d 351, 355 (N.Y. 1978) (alteration in *Greenfield*)). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation ... unless each is a 'reasonable' interpretation." *L. Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (citations omitted). "[A] court may not admit extrinsic evidence in order to determine the meaning of an unambiguous contract." *Omni Quartz*, 287 F.3d at 64 (citing cases); *see also S. Rd. Assocs.*, 4 N.Y.3d at 278 ("extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face").

It is well-settled that "[a]n omission or mistake in a contract does not constitute an ambiguity [and] ... the question of whether an ambiguity exists must be ascertained from the face of an agreement without regard to extrinsic evidence." *Reiss v. Financial Performance Corp.*, 97 N.Y.2d 195, 199 (N.Y. 2001); *see also Millgard Corp. v. E.E.Cruz/Nab/Fronier-Kemper*, No. 99-CV-2952 (LBS), 2003 WL 22741664, at *3 (S.D.N.Y. Nov. 18, 2003) ("under New York law, the omission of terms in a contract does not create ambiguity.") (quoting *Schmidt v. Magnetic Head Corp.*, 97 A.D.2d 151 (N.Y. App. Div. 1983)); *Greenfield*, 98 N.Y.2d at 573 ("[S]ilence does not equate to a contractual ambiguity") (citing cases).

**\*7**   "[I]f the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity." *Greenfield*, 98 N.Y.2d at 569–70. "This principle is particularly important 'in the context of real property transactions, where commercial certainty is a paramount concern, and where ... the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length." *S. Rd. Assocs.*, 4 N.Y.3d at 277 (quoting *Vermont Teddy Bear*, 1 N.Y.3d at 475 (alteration in *S. Rd. Assocs.*)). "[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Vermont Teddy Bear*, 1 N.Y.3d at 475 (quoting *Reiss*, 97 N.Y.2d at 199).

"Furthermore, where a contract contains a merger clause, a court is obliged 'to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing.' " *Shron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (N.Y. 2013) (quoting *Matter of Primex Int'l. Corp. v. Wal-Mart Stores*, N.Y.2d 594, 599 (N.Y. 1997)).

Case 1:25-cv-00341-LEK-MJK    Document 3    Filed 03/28/25    Page 48 of 62

One Stop 34, LLC v. Stimdel Properties (FL), Inc., Not Reported in Fed. Supp. (2021)

Whether a contract is ambiguous is a question of law to be decided by the court. *Greenfield*, 98 N.Y. 2d at 569 (citing *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (N.Y. 1990)); *see also Omni Quartz*, 287 F.3d at 64.

### B. Whether the Lease is Ambiguous

Plaintiff does not point to any language in the Lease that it claims to be ambiguous. Rather, it argues that the Lease is ambiguous because it "does not expressly provide for any form of access to a meaningful portion of the Demised Premises (everything other than the warehouse building, and even then no access to the loading docks), and without access the Lease makes no sense ..." (Pl. Opp. at 11.) It finds ambiguity in that "although the Lease grants One Stop and its licensees use, possession and control of the Demised Premises, it does not, either expressly or otherwise, provide them with the means to use the Demised Premises for the purposes intended, since it does not provide access to the Demised Premises, as defined in the Lease, from a public street." (*Id.*)

What Plaintiff claims to be an ambiguity is, in fact, an omission, and omissions do not constitute ambiguity. *See Reiss*, 97 N.Y.2d at 199. Nothing within the language of the Lease itself suggests that the parties intended for Plaintiff and its lessees to have access to the parking area and loading docks of the Demised Premises by traveling through any portion of the Adjoining Property. Indeed, the Lease does not mention either the parking area or the loading docks. Certainly, there is no mention of the approximately 6000 square feet of land on the Adjoining Property which Plaintiff describes as the Common Area.

In the context of a commercial contract, New York courts are particularly reluctant to find ambiguity from absent terms. *See, e.g., Vermont Teddy Bear*, 1 N.Y.3d at 475 (in construing commercial real property contracts, "courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.") (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 72 (N.Y. 1978)). Because the Lease does not contain *any* term regarding access to the parking and loading area of the Demised Premises, there is no basis for finding that the parties intended to create such form of access, especially access entailing property not covered by the Lease.

Plaintiff argues, in the alternative, that the absence of a provision for access to the loading and parking area of the Demised Premises is "an omission as to a material issue," which can create an ambiguity. (Pl. Opp. at 13, citing *Hart v. Kinney Drugs, Inc.*, 67 A.D.3d 1154, 1156-57 (N.Y. App. 2009) and *In re World Trade Center Disaster Site Litigation*, 754 F.3d 114, 122 (2d Cir. 2014) ("In limited circumstances, a court may supply a missing term in a contract.")).

 **\*8**  Plaintiff's argument misconstrues the meaning of the term "omission" in this context. Every ambiguity in a contract is, essentially, the product of an incomplete or inconsistent description of a material term or contingency in a contract. Put simply, ambiguity arises from the absence of clarifying language. But Plaintiff does not seek to supply a missing material term in the Lease that would clarify the Lease. Instead, it seeks to add an entirely new and discrete provision: that of access to the parking and loading area.

Neither *Hart* nor *In re World Trade Center* supports Plaintiff's argument, because neither involved the addition of an entirely new provision to a contract. Instead, both cases allowed the admission of extrinsic evidence to cure ambiguity as to terms already contained in the underlying contracts. In *Hart*, a landlord and tenant entered into a memorandum of understanding that modified a prior rental agreement. The Appellate Division held that the memorandum was ambiguous as to whether it was intended to entirely replace the rent structures of the original agreement or to partially alter them. 67 A.D.3d at 1156-57. The court acknowledged an "anomaly *within the four corners of the memorandum* [that] suggests the possibility" of a missing term regarding the percentage rent structure for the three properties with increased base rents. *Hart*, 67 A.D.3d at 1156 (emphasis added). Thus, *Hart* identified an ambiguity within a term of the contract—the rental payments—and admitted extrinsic evidence to clarify that term. *See id.* Here, by contrast, a loading or parking area is never mentioned in the Lease, let alone any access to such area. Thus, nothing within the Lease suggests that a missing term was necessary to clarify any provision in the Lease.

In *In re World Trade Center,* the district court interpreted a settlement agreement term "Plaintiffs who dismiss" as including both plaintiffs whose dismissals were involuntary as well as those whose dismissals were voluntary. 754 F.3d at 117, 119, 123.

The Second Circuit concluded, however, that the contract was ambiguous because "reasonable minds could disagree" as to the meaning of "Plaintiffs who dismiss," noting that the agreement did not expressly state whether that phrase included or excluded involuntary dismissals, and that the definitions of terms within the agreement led to conflicting conclusions about whether involuntary dismissals should be included. *Id.* at 123-24. The appeals court thus remanded the case for the district court to consider extrinsic evidence of the parties' intent. *Id.* at 124. *In re World Trade Center* is, therefore, a standard application of the general rule that extrinsic evidence may be admitted only to clarify an ambiguity within a contract; it does not support Plaintiff's attempt to use extrinsic evidence to create an entirely new obligation otherwise unspecified or unsuggested in the Lease.

The other cases Plaintiff references in its opposition are similarly inapposite. In *City of Yonkers v. Otis Elevator Co.*, 844 F.2d 42 (2d Cir. 1988), the Court refused "to add an obligation to the contract between the parties which appears manifestly unreasonable on the record before us, rather than an obvious requirement of justice and fair dealing." The Second Circuit's decision not to impose a term where it was unreasonable does not suggest that the Court here should impose an entirely new term of access. *Haines v. City of New York*, 41 N.Y.2d 769 (N.Y. 1977) concerned the application of a default rule regarding whether a contract to perform services with no fixed duration was perpetual or terminable at will, and the Court of Appeals expressly stated that the rule it chose—that contracts without a fixed duration "will imply that they intended performance to continue for a reasonable time"—was not a general rule. *See id.* at 772-73. The narrow holding of *Haines* cannot be generalized to this case.

*\*9* Plaintiff argues that without a term added to the Lease describing how Plaintiff can access the parking and loading area, Plaintiff's rights to the Demised Premises in the Lease would "become illusory" and the Lease would be "nonsensical." (*See* Pl. Opp. at 17.) However, Plaintiff does not cite any cases to support this argument, and New York law does not provide for such relief.

In any event, the absence of any provision about access to the parking area does not render the Lease nonsensical. Plaintiff's argument presumes that driving into the parking area and accessing the loading docks is essential to the Lease's purpose. (*See id.* at 10 ("absent the right to access the Demised Premises via the Common Area ... the right to use and occupy the Demised Premises for the purposes intended becomes illusory, since vehicles cannot access the parking lot and loading bays within the Demised Premises without entering the parking area through the fence gates and traversing across the Common Area.")). But the best evidence of the Lease's purpose—the language of the document—does not support Plaintiff's position. *See Greenfield*, 98 N.Y.2d at 569 ("The best evidence of what parties to a written agreement intend is what they say in their writing."); *see also Acranom Masonry, Inc. v. Wenger Constr. Co.*, No. 14-CV-1839 (PKC), 2017 WL 4358751, at \*13 (E.D.N.Y. Sept. 29, 2017) (declining to consider extrinsic evidence to add a term where the contract did not contain ambiguity on its face as to the parties' intent). As noted *supra*, the Lease does not mention the parking area, the loading docks, or the access gates. By contrast, it repeatedly mentions the Building. [2] The Lease laid out the metes and bounds of the Demised Premises, and the parties agreed that they inspected it, which would have made clear where there were and were not access points to particular parts of the property. (Lease § 7.1 ("Tenant has inspected the Demised Premises and accepts the same on the date hereof, subject to the representations, warranties and covenants of Landlord in this Lease.")

*\*10* Finally, Plaintiff urges the Court to look at the evidence of the parties' representations before and behavior after the signing of the contract with regard to Plaintiff's use of the Common Area. The marketing brochure describing "Off-street loading and parking" and a "shared loading area and parking lot" (Ex. 1 to Gildin Decl. at 3) was not incorporated into the Lease, so its terms are not controlling. *See Sioris v. 25 W. 43rd St. Co.*, 223 A.D.2d 475, 475 (N.Y. App. Div. 1996) (precluding reliance upon prior representations not incorporated into the lease where lease contained a merger clause). Moreover, actions by Defendant and DHL permitting Plaintiff access through the Adjoining Property for some time after the Lease was signed does not create a contractual obligation here. New York law prohibits consideration of such post-signing "course of conduct" extrinsic evidence when construing an unambiguous lease. *See, e.g.*, *Lockheed Martin* Corp. v. *Retail Holdings, N.V.*, 639 F.3d 63, 71 (2d Cir. 2011) ("Because the contract is unambiguous, it was error for the district court to consider extrinsic evidence of the parties' post-contract conduct.") Thus, despite Defendant's words and actions expressly permitting Plaintiff to use the Common Area to access the outside area of the Demised Premises, such conduct alone does not constitute a binding contract. The presence of the merger clause only strengthens this conclusion. (Lease § 15.5.) *See Shron*, 20 N.Y.3d at 436; *see also Millgard Corp.*, 2003

WL 22741664, at \*5 ("Ambiguity sufficient to warrant admission of parol evidence despite a merger clause must be intrinsic to the document in question.")

Based on the above analysis, the undersigned finds that the Lease is unambiguous and does not provide for access to the Demised Premises through the "Common Area." Because there is no ambiguity within the Lease, the undersigned declines to consider extrinsic evidence.

### C. Whether Plaintiff Can Recover Damages for Defendant's Refusal to Allow Access to the Demised Premises Through the Adjoining Property

Defendant moves the Court to dismiss Plaintiff's claim for breach of contract for refusing to permit access to and use of the "Common Area" within the Adjoining Property parking lot. (Motion at 1.) In order to prove a breach of contract claim under New York law, Plaintiff must show "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).

Because the Lease does not require Defendant to allow Plaintiff and its licensees access to the Demised Premises through the Adjoining Property, its refusal to permit use of the "Common Area" does not constitute a breach of the Lease. Accordingly, the undersigned respectfully recommends that Defendant be granted summary judgment on Plaintiff's breach of contract claim based on denial of such access.

### D. The Declaratory Judgment Claim and Counterclaim

The Motion requests that the Court dismiss Plaintiff's claim for declaratory judgment that Plaintiff "is entitled to access and use the Common Area for ingress and egress for itself and its Licensees," (Compl. ¶ 44) and that the Court grant Defendant's counterclaim for declaratory judgment declaring that Plaintiff and its agents and representatives "are not permitted to access or use the Adjoining Property" (Amended Answer ¶ 92). (*See* Motion at 1-2.)

A declaratory judgment is available in federal court "to resolve a 'real question of conflicting legal interests.' " *Associated Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 35 (2d Cir. 1992) (citations omitted). The Declaratory Judgment Act requires that there be a "case of actual controversy" in order for a court to declare legal rights and other legal relations. 28 U.S.C. § 2201(a). " ' 'A justiciable controversy' may not be 'hypothetical or abstract' in nature, but rather must be 'a real and substantial controversy....' " *FSP, Inc. v. Societe Generale*, No. 02-CV-4786 (GBD), 2003 WL 124515, at \*4-5 (S.D.N.Y. Jan. 14, 2003), *aff'd and remanded*, 350 F.3d 27 (2d Cir. 2003), and *adhered to on reconsideration*, 2005 WL 475986 (S.D.N.Y. Feb. 28, 2005).

A district court has discretion to exercise jurisdiction over a declaratory judgment action. *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005). "In a case of actual controversy within its jurisdiction ... any court of the United States ... *may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *Id.* (quoting 28 U.S.C. § 2201(a) (emphasis in original).) "In order to decide whether to entertain an action for declaratory judgment, [the Second Circuit has] instructed district courts to ask: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade*, 411 F.3d at 389 (citing *Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1969)).

**\*11** Both Plaintiff's claim for declaratory judgment and Defendant's counterclaim for declaratory judgment hinge on resolution of the same issue that forms the basis of Plaintiff's breach of contract claim, *i.e.,* Plaintiff's entitlement to use the Adjoining Property to access the Demised Premises. Courts routinely decline to grant declaratory judgments that "seek[ ] resolution of issues that will, of necessity, be resolved in the course of the litigation of the other causes of action." *George & Co., LLC v. Spin Master Corp.*, No. 19-CV-04391 (RPK)(SJB), 2020 WL 7042665, at \*5 (E.D.N.Y. Nov. 30, 2020) (quoting *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 249 (S.D.N.Y. 2006)); *see also Zam & Zam Super Mkt., LLC v. Ignite Payments,*

One Stop 34, LLC v. Stimdel Properties (FL), Inc., Not Reported in Fed. Supp. (2021)

Case 1:25-cv-00341-LEK-MJK    Document 3    Filed 03/28/25    Page 51 of 62

*LLC*, No. 16-CV-6370 (SJF)(AYS), 2017 WL 6729854, at *11 (E.D.N.Y. Oct. 31, 2017), *aff'd*, 736 F. App'x 274 (2d Cir. 2018) ("Courts have deemed '[a] cause of action for a declaratory judgment [a]s unnecessary and inappropriate when the plaintiff has an adequate, alternative remedy in another form of action, such as breach of contract.' ") (quoting *J.C. Penney Corp. v. Carousel Ctr. Co., L.P.*, 635 F. Supp. 2d 126, 135 (N.D.N.Y. 2008)) (alteration in *Zam & Zam*).

Here, resolution of that portion of Plaintiff's breach of contract claim that it is based on Defendant's refusal to grant Plaintiff and its licensees access to the "Common Area" also resolves the issue on which the parties seek declaratory judgments. The Court's interpretation of the Lease in order to determine whether there was a breach of contract makes clear the entitlements at issue in the proposed judgments. Therefore, declaratory judgment on the issue of whether Plaintiff must be permitted or denied use of the Adjoining Property to access the Demised Premises would be duplicative and not serve a useful purpose. As such, declaratory judgments would be inappropriate.

Accordingly, the undersigned respectfully recommends that the Motion be denied as to Defendant's request for declaratory judgment that Plaintiff and its agents and representatives are not permitted to access or use the Adjoining Property, and granted as to the request for dismissal of Plaintiff's declaratory judgment claim.

## II. Plaintiff's Other Damages Claims

Defendant seeks summary judgment on Plaintiff's claims for (1) any consequential damages because they were not within the parties' contemplation and Plaintiff has not pointed to any evidence of such damages, (2) damages arising out of the Sewage Leak because of an accord and satisfaction, and (3) any reputational damages because such damages are not recoverable under New York law and there is no evidence of them.

### A. Whether Plaintiff Can Recover Consequential Damages

Defendant argues that, as a matter of law, Plaintiff is not entitled to consequential damages for lost license fees because the parties did not contemplate consequential damages in the making of the contract, and that even if Plaintiff were so entitled, there is no evidence of such damages. (Def. Mem. Of Law at 16-19, Reply at 8-9.) Plaintiff counters that whether the parties contemplated consequential damages is a question of fact that precludes summary judgment. (Pl. Opp. at 17-19.)

"It is well established that in actions for breach of contract, the nonbreaching party may recover general damages which are the natural and probable consequence of the breach." *Kenford Co. v. Cty. of Erie*, 73 N.Y.2d 312, 319 (N.Y. 1989) (*Kenford II*). "Special, or consequential damages, which 'do not so directly flow from the breach,' are also recoverable in limited circumstances." *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187, 192 (N.Y. 2008) (quoting *American List Corp. v. U.S. News & World Report*, 75 N.Y.2d 38, 43 (N.Y. 1989)). "When a non-breaching party alleges a loss of profits on collateral business arrangements as a result of a breach, the claim is considered one for consequential damages." *Lorena Int'l N. Am., Inc. v. Vican Trading*, No. 08-CV-2686 (CPS)(SMG), 2009 WL 1940428, at *3 (E.D.N.Y. July 2, 2009) (citing *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007)); *see also Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000) ("The type of consequential damages most often sought is lost operating profits of a business.") (citation omitted).

**\*12** To recover consequential damages,

it must be shown that: (1) the damages were caused by the breach; (2) the alleged loss must be capable of proof with reasonable certainty, and (3) the particular damages were within the contemplation of the parties to the contract at the time it was made.

Case 1:25-cv-00341-LEK-MJK    Document 3    Filed 03/28/25    Page 52 of 62

One Stop 34, LLC v. Stimdel Properties (FL), Inc., Not Reported in Fed. Supp. (2021)

*Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 404 (N.Y. 1993) (referring to *Kenford Co., Inc. v. Erie Cty.*, 67 N.Y.2d 257, 261 (N.Y. 1986) (*Kenford I*)).

It is not necessary here to decide whether consequential damages were foreseeable and within the contemplation of the parties at the time the contract was made, because Plaintiff has failed to point to any evidence that damages were caused by the breach or that the damages can be proven with reasonable certainty. Although Plaintiff alleges lost license fees and other damages caused by the breach, it cites to no evidence to support its claim. (*See* Pl. Opp. at 18-19.) *See also Salahuddin*, 467 F.3d at 273 ("[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment.").

One email filed in support of Plaintiff's Opposition references Plaintiff's allegation that it is entitled to "actual lost revenues due to licensees having vacated the damaged area" as a result of the Sewage Leak, but Plaintiff does not identify which licensees vacated the area, how much Plaintiff lost in revenues, and how such lost license revenues were linked to the Sewage Leak. (Ex. 6 to Gildin Decl. at D000515; Ex. 7 to Gildin Decl., Dkt. 48-10 at PL000000177.) [3] Plaintiff does not rely on this email in its briefing, and this conclusory claim is insufficient to satisfy Plaintiff's burden on summary judgment. *See Georgitsi Realty, LLC v. Penn-Star Ins. Co.*, No. 08-CV-4462 (LDH)(ST), 2018 WL 4344941, at *1 (E.D.N.Y. Sept. 11, 2018) ("To survive summary judgment, the non-movant must present concrete evidence and rely on more than conclusory or speculative claims.") (citing *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980)).

Because Plaintiff has not offered any evidence to support two necessary elements of a consequential damages claim—causation and provability—the undersigned respectfully recommends that summary judgment be granted in favor of Defendant as to Plaintiff's consequential damages claims.

## B. Whether the Doctrine of Accord and Satisfaction Bars Plaintiff's Damages Claims Relating to the Sewage Leak

Defendant argues that the doctrine of accord and satisfaction warrants summary judgment on Plaintiff's damages claims relating to the Sewage Leak. (Def. Mem. Of Law at 19-20; Reply at 10.) While Plaintiff has withdrawn its claim for repair costs related to the Sewage Leak (Pl. Opp. at 19 n.3), it continues to assert its claim for lost license fees, arguing that such consequential damages are "clearly outside the scope of the rent abatement which forms the basis of the accord and satisfaction theory." (*Id.*)

**\*13**  As discussed in the previous section, because there is no evidence of consequential damages, Plaintiff's remaining claim for damages arising from the Sewage Leak fails. But even if it were entitled to consequential damages, the scope of the rent abatement for the Sewage Leak expressly included those damages, and Plaintiff's claim is barred by accord and satisfaction.

"An accord and satisfaction, as its name implies, has two components. An accord is an agreement that a stipulated performance will be accepted, in the future, in lieu of an existing claim. Execution of the agreement is a satisfaction." *Denburg v. Parker Chapin Flattau & Klimpl*, 82 N.Y.2d 375, 383 (N.Y. 1993). "As a general rule, the acceptance of a check in full settlement of a disputed, unliquidated claim, without any reservation of rights, operates as an accord and satisfaction discharging the claim." *Nationwide Registry & Sec., Ltd. v. B & R Consultants, Inc.*, 4 A.D.3d 298, 299 (N.Y. App. Div. 2004) (citing cases). "[T]he doctrine requires a 'clear manifestation of intent by the parties that the payment was made, and accepted, in full satisfaction of the claim.' " *Rosenthal v. Quadriga Art, Inc.*, 105 A.D.3d 507, 508 (N.Y. App. Div. 2013) (quoting *Nationwide Registry & Sec., Ltd. v. B & R Consultants, Inc.*, 4 A.D.3d 298, 300 (N.Y. App. Div. 2004)).

Here, Plaintiff agreed to accept a rent credit in lieu of any other claims. Plaintiff demanded reimbursement for the costs incurred in repairing the Sewage Leak. (Def. 56.1 ¶ 21; Pl. Response 56.1 ¶ 21.) Plaintiff's CFO and in-house counsel wrote to Defendant that Plaintiff "decided to eat" the "myriad of other costs relating to [the Sewer Leak]," including "legal fees, having to give free rent, etc.... so long as the amounts due [Plaintiff] are settled as soon as possible." (Ex. J to Def. Mot. at D000614.) Although the parties continued to negotiate the exact amount of the rent credit, Defendant eventually offered a $57,745.04 rent credit, which Plaintiff accepted. (Ex. 7 to Gildin Decl. at PL000000150-151.) In accepting the rent credit, Plaintiff's CFO and in-

Case 1:25-cv-00341-LEK-MJK    Document 3    Filed 03/28/25    Page 53 of 62

One Stop 34, LLC v. Stimdel Properties (FL), Inc., Not Reported in Fed. Supp. (2021)

house counsel noted that he was "happy this situation is behind us." (*Id.* at PL000000150.) The terms of the agreement are unambiguous and encompass the consequential damages that Plaintiff "decided to eat."

The agreement was then executed. (Def. 56.1 ¶¶ 22-23; Pl. Response 56.1 ¶¶ 22-23.) Because there is no genuine dispute of material fact, the undersigned finds that Plaintiff's claim for consequential damages arising from the Sewage Leak is barred by accord and satisfaction.

Accordingly, the undersigned respectfully recommends that summary judgment be granted in favor of Defendant as to Plaintiff's consequential damages claims related to the Sewage Leak.

### C. Whether Plaintiff Can Recover Reputational Damages

Defendant also seeks summary judgment on Plaintiff's reputational damages claims. (Def. Mem. Of Law at 20.) "In general, damages to reputation 'are not recoverable in a breach of contract action under New York law.' " *Premier Fla. Auto Sales & Leasing, LLC v. Mercedes-Benz of Massapequa, LLC,* No. 10-CV-4428 (DRH)(WDW), 2013 WL 2177785, at *5 (E.D.N.Y. May 20, 2013) (quoting *Ainbinder v. Money Center Fin. Group, Inc.,* No. 10-CV-05270 (SJF)(AKT), 2013 WL 1335997, *10 (E.D.N.Y. Feb. 28, 2013)), *R&R adopted,* 2013 WL 1335893 (E.D.N.Y. Mar. 25, 2013). "However, damages to reputation may be available where a plaintiff can prove specific business opportunities lost as a result of its diminished reputation." *Premier Fla. Auto Sales,* 2013 WL 217785, at *5 (citing cases) (internal quotations omitted).

 **\*14**  Defendant contends that there is no evidence of any specific lost business opportunities. (Def. Mem. Of Law at 20.) Plaintiff does not make any argument on this point in its Opposition (*see* Pl. Opp.), and Defendant argues that Plaintiff therefore concedes it is not entitled to reputational damages (Reply at 10). The absence of evidence of specific lost business opportunities entitles Defendant to judgment as a matter of law as to reputational damages. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) ("The moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof") (internal quotations omitted).

Accordingly, the undersigned respectfully recommends that summary judgment be granted in favor of Defendant as to Plaintiff's reputational damages claims.

### III. Whether Defendant Can Recover Attorneys' Fees and Costs

Defendant seeks reasonable attorneys' fees and costs related to this action. (Motion; Def. Mem. Of Law at 21.) "[I]n a breach of contract case, a prevailing party may not collect attorneys' fees from the nonprevailing party unless such award is authorized by agreement between the parties, statute or court rule." *TAG 380, LLC v. ComMet 380, Inc.,* 10 N.Y.3d 507, 515 (N.Y. 2008). The Lease expressly provides for attorneys' fees and costs. (Lease § 19.3 ("In any action or proceeding to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to recover such party's reasonable costs of suit, including reasonable attorneys' and expert's fees and related expenses, in addition to all other recovery or relief.").

Because resolution of the Motion does not completely resolve this case, including other pending claims related to breach of contract, the undersigned respectfully recommends that Defendant's motion for fees and costs be denied with leave to renew upon final resolution as to all claims in this matter.

### IV. Conclusion

For the foregoing reasons, the undersigned respectfully recommends that the Motion be granted as follows: that the Court dismiss that portion of Plaintiff's claim for breach of contract that is based on Defendant's refusal to allow Plaintiff and its licensees access to the Demised Premises through the Adjoining Property; that the Court deny recovery of any consequential

Case 1:25-cv-00341-LEK-MJK    Document 3    Filed 03/28/25    Page 54 of 62

One Stop 34, LLC v. Stimdel Properties (FL), Inc., Not Reported in Fed. Supp. (2021)

damages, reputational damages, and damages arising from the Sewage Leak; and that the Court dismiss Plaintiff's claim for declaratory judgment.

The undersigned respectfully recommends that the Motion to be denied as to Defendant's Second Counterclaim for declaratory judgment. The undersigned further respectfully recommends that the Court deny Defendant's request for attorneys' fees and costs without prejudice, but with leave to renew its request after trial or other resolution of all claims and counterclaims in this action.

Any written objections to this Report and Recommendation must be filed within 14 days of service of this report. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to file objections within the specified time waives the right to appeal any order or judgment entered based on this Report and Recommendation. *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008).

**All Citations**

Not Reported in Fed. Supp., 2021 WL 8344133

---

## Footnotes

1    Plaintiff "withdr[e]w its claim for damages arising from its expenditure of money to repair the sewage leak." (Pl. Opp. at 19 n.3), but not its claim for consequential damages.

2    *See* Lease at PL000000001 (describing the Demised Premises as "that certain building ... and the land on which the Building sits ..."); § 1.4(b)(i) (Defendant "shall deliver the Building broom clean with all personal property removed"); § 1.4(b)(ii) ("the heating and electrical systems and all doors will be in good working order on the date possession is delivered to [Plaintiff]"); § 3.2(iv) (prohibiting use that would "cause or be likely to cause structural damage to the buildings or any part thereof"); § 7.2 (requiring Plaintiff to "take good care of the Demised Premises, including the Building and all facilities installed therein" and allowing renovation and installation of bathrooms); § 7.4 (prohibiting "any alterations, modifications, or improvements to the Building ... without Landlord's prior written consent," except those "costing less than $25,000 per instance which do not affect the Building's systems or structure and do not penetrate the roof structure or membrane ..."); § 16.3 (prohibiting signage "on the exterior of the Building or the exterior doors of the building, or elsewhere at any point within the Demised Premises, without prior written approval of [Defendant]"); Article 22 at PL000000033 (limiting Defendant's right to terminate lease based on demolition or alteration of material portion of the Building, but making no reference to the parking lot or loading docks).

3    The same email is reproduced in both Exhibits 6 and 7 to the Gildin Declaration.

---

End of Document    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 4237110
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Boris TEICHMANN, Plaintiff,

v.

NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, Defendant.

21 Civ. 5082 (LGS)
|
Signed September 14, 2022

**Attorneys and Law Firms**

Boris Teichmann, New York, NY, Pro Se.

Thomas John Rizzuti, New York City Law Department, New York, NY, for Defendant.

**OPINION AND ORDER**

LORNA G. SCHOFIELD, District Judge:

 **\*1**  Plaintiff *pro se* Boris Teichmann brings this action against Defendant New York City Employees' Retirement System ("NYCERS"), alleging violations of due process under the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983 and under the analogous provision of the New York Constitution, breach of contract and intentional infliction of emotional distress. Defendant moves to dismiss the Amended Complaint. For the reasons stated below, Defendant's motion is granted in part and denied in part.

**I. BACKGROUND**

The following facts are taken from the Amended Complaint, documents incorporated by reference in it, Plaintiff's opposition to Defendant's motion and exhibits thereto (collectively, the "Complaint"), and documents of which the Court may take judicial notice. *See Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021). Plaintiff's non-pleading filings are considered here because he is pro se. *See Felder v. U.S. Tennis Ass'n*, 27 F.4th 834, 839 n.4 (2d Cir. 2022). Plaintiff's allegations are accepted as true and construed in the light most favorable to the Plaintiff. *Raymond Loubier Irrevocable Tr. v. Loubier*, 858 F.3d 719, 725 (2d Cir. 2017). The Court takes judicial notice of administrative and state court records of proceedings concerning Plaintiff's pension benefits that Defendant submitted with its motion only for the fact that certain statements were made, "without regard to the truth of their contents." *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 (2d Cir. 2022) (cleaned up).

Until 2001, Plaintiff worked for the New York City Department of Housing Preservation and Development ("HPD"). Plaintiff became a vested member of NYCERS in 1988, and membership entitles him to pension benefits under certain circumstances. Plaintiff was injured on the job and as a result suffers from post-traumatic stress disorder, anxiety and other conditions that substantially interfere with activities of daily life. Plaintiff stopped working for HPD on December 9, 2001.

On December 18, 2008, Plaintiff filed his first application for disability pension benefits (the "2008 Application"). The application was deemed untimely and "could not be processed" because HPD's records showed that he had not been employed by HPD for over seven years. An application must "be filed within 3 months from the last date the member was paid on the payroll," or within a year of being discharged. N.Y. Retire. & Soc. Sec. Law § 605.

Teichmann v. New York City Employees' Retirement System, Not Reported in Fed....

Case 1:25-cv-00341-LEK-MJK    Document 3    Filed 03/28/25    Page 56 of 62

On November 10, 2011, HPD rescinded Plaintiff's "termination dated December 9, 2001," and placed him "on a no-cost leave without pay from December 9, 2001 for the sole purpose of allowing [him] to file for Disability retirement" within 30 days. On November 23, 2011, Plaintiff filed a second application (the "2011 Application"). On June 8, 2017, Defendant granted the 2011 Application, following two denials that were vacated and remanded following petitions by Plaintiff under Article 78.

In the June 8, 2017, decision, Defendant determined Plaintiff's retirement date for benefits purposes to be December 23, 2011, "the 30th day from the date on which [Plaintiff's] approved application was filed." Defendant's decision cited 2 N.Y.C.R.R. § 309.6, which provides that the effective date of retirement for purposes of disability retirement benefits is "the date of filing of such disability retirement application or on the day after the last date on which the member receives salary, whichever is later."

**\*2** Plaintiff sought clarification of the June 8, 2017, decision in several letters. On January 12, 2018, he asked for his benefits to be paid from "December 18, 2008 when [he] first applied for said pension," because he had been on unpaid leave at the time, not discharged from employment. Defendant responded on January 30, 2018, by reiterating that the 2008 Application "was not timely filed and was therefore not processed." On March 17, 2018, Plaintiff made the same request, and Defendant gave a similar response on April 17, 2018. Defendant also explained for the first time that, while Plaintiff was "eligible to submit a disability application" after having his status changed to leave without pay in 2011, his 2008 Application was untimely because his "status with [his] agency was not retroactive to [his] termination date of December 9, 2001."

On May 12, 2018, Plaintiff sent another letter, this time attaching a letter from HPD stating that his unpaid leave was "retroactively extended from December 9, 2001 to November 10, 2011." Defendant responded on June 11, 2018, and acknowledged that "[e]xtending your leave without pay status retroactively makes your December 18, 2008 disability application valid." Defendant stated that, ordinarily if a valid application "were to be considered, to be awarded a disability pension under this application, NYCERS Medical Board would have to find that you were disabled as of the date you filed this application, i.e., December 18, 2008." However, Defendant stated that "[t]he NYCERS Medical Board did not consider your December 18, 2008 application because you were not on payroll at the time you submitted it." No determination of Plaintiff's disability status as of 2008 was ever made.

Defendant explained its refusal even to consider Plaintiff's 2008 Application as follows:

> By being placed on leave without pay, you are still on payroll with your agency. Accordingly, your employment did not terminate until November 10, 2011. You filed for Disability Retirement on November 23, 2011. Therefore, based on NYCERS Rules, your retirement date was set at thirty (30) days after the date of filing of your application ...."

Defendant continued, "even if found disabled under [the 2008 Application], the [May 10, 2018] letter does not change your retirement date which must be the last day on payroll or the date you filed your application, whichever is later. As a result, your retirement date of December 23, 2011 shall remain." Under NYCERS rules, the effective date of retirement for purposes of Plaintiff's benefits is the "Later of: 30 days after the date the application is filed with NYCERS **or** Day after last day you were paid on your employer's payroll."

After receiving the June 11, 2018, letter, Plaintiff filed an Article 78 petition challenging Defendant's decision as arbitrary and capricious. His petition was dismissed as time barred by the four-month statute of limitations for Article 78 suits. The Appellate Division, First Department, affirmed. *Teichmann v. NYCERS*, 111 N.Y.S.3d 176 (1st Dep't 2019). The Court of Appeals denied leave to appeal in September 2020. *Teichmann v. NYCERS*, 152 N.E.3d 163 (N.Y. 2020). Plaintiff filed this action on June 7, 2021.

Case 1:25-cv-00341-LEK-MJK    Document 3    Filed 03/28/25    Page 57 of 62

Teichmann v. New York City Employees' Retirement System, Not Reported in Fed....

## II. STANDARD

On a motion to dismiss, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party but does not consider "conclusory allegations or legal conclusions couched as factual allegations." *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (internal quotation marks omitted). To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *accord Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 189 (2d Cir. 2020). It is not enough for the Complaint to allege facts that are consistent with liability; it must "nudge[ ]" claims "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Bensch v. Estate of Umar*, 2 F.4th 70, 80 (2d Cir. 2021). To survive dismissal, "plaintiffs must provide the grounds upon which [their] claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 121 (2d Cir. 2019) (alteration in original) (internal quotation marks omitted).

 **\*3**  Courts must "afford a pro se litigant 'special solicitude' by interpreting a complaint filed pro se to raise the strongest claims that it suggests." *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018) (internal quotation marks omitted).

## III. DISCUSSION

### A. Substantive Due Process

Plaintiff's due process claim is dismissed to the extent it relies on alleged substantive due process violations, because the Complaint does not allege that Defendant acted so arbitrarily as to violate the Constitution.

"The first step in substantive due process analysis is to identify the constitutional right at stake." *Hurd v. Fredenburgh*, 984 F.3d 1075, 1087 (2d Cir. 2021). If such a right has been infringed, "the plaintiff 'must demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Hurd*, 984 F.3d at 1087. If the constitutional right is the deprivation of property without due process of law, a complaint must allege that Plaintiff "had a valid property interest" and "defendants infringed on that property right in an arbitrary or irrational manner." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 545 (2d Cir. 2014); *accord Kampfer v. Argotsinger*, 856 F. App'x 331, 334 (2d Cir. 2021) (summary order).

District courts have recognized that continued pension payments are a protected property interest under the Fourteenth Amendment. *See Smalls v. NYCERS*, No. 18 Civ. 5428, 2019 WL 3716444, at \*4 (S.D.N.Y. Aug. 7, 2019); *Dukes v. NYCERS*, 361 F. Supp. 3d 358, 375 (S.D.N.Y. 2019). But any deprivation of Plaintiff's pension rights in this case did not deprive Plaintiff of substantive due process. The Complaint alleges that Defendant set Plaintiff's retirement date based on the end of his unpaid medical leave and/or the date of the 2011 Application. Defendant's decision -- to set Plaintiff's retirement date based on the last day he was "on payroll," rather than the last day he was actually "paid" -- may well be wrong, but it is not so arbitrary and unjustifiable as to shock the conscience. "Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill advised." *Cunney v. Bd. of Trs.*, 660 F.3d 612, 626 (2d Cir. 2011); *see United States v. Ash*, 464 F. Supp. 3d 621, 632 (S.D.N.Y. 2020). Even if Defendant erred in limiting Plaintiff's benefits, "substantive due process does not entitle federal courts to examine every alleged violation of state law, especially ones that, while perhaps vexatious, are more routine than egregious." *Kuck v. Danaher*, 600 F.3d 159, 167 (2d Cir. 2010); *accord Marom v. Town of Greenburgh*, No. 18 Civ. 7637, 2020 WL 978514, at \*12 (S.D.N.Y. Feb. 28, 2020); *cf. Durgin v. Town of Madison*, No. 10 Civ. 347, 2011 WL 692989, at \*3, \*6-8 (D. Conn. 2011) (denying motion to dismiss substantive due process claim for denial of disability pension that was issued with *no* reasoning whatsoever).

The same analysis applies to Plaintiff's substantive due process claim under the New York Constitution. *Myers v. Schneiderman*, 31 N.Y.S.3d 45, 52 (1st Dep't 2016) ("In general, the New York Court of Appeals uses the same analytical framework as the

Case 1:25-cv-00341-LEK-MJK    Document 3    Filed 03/28/25    Page 58 of 62

Teichmann v. New York City Employees' Retirement System, Not Reported in Fed....

Supreme Court in considering due process cases ...."); *see also People ex rel. Johnson v. Superintendent, Adirondack Corr. Facility,* 163 N.E.3d 1041, 1049 n.7 (N.Y. 2020) (noting that "increased constitutional due process protections under the State Constitution" are limited to specific areas "in the absence of a fitting federal jurisprudence").

## B. Procedural Due Process

**\*4** Defendant's motion to dismiss is denied with respect to the section 1983 claim for a violation of procedural due process. The Complaint adequately alleges that Plaintiff was deprived of pension benefits pursuant to his 2008 Application without due process. The claim is not barred by section 1983's three-year statute of limitations because it accrued on June 11, 2018, when Defendant acknowledged the validity of Plaintiff's 2008 Application and refused to consider it. Collateral estoppel does not apply because the state court found only that a different claim pertaining to Defendant's June 17, 2017, decision had accrued on June 17, 2017. The *Rooker-Feldman* doctrine is inapplicable because the Complaint does not allege injuries caused by the state court judgment or invite review and rejection of the judgment. Plaintiff's claim is dismissed to the extent it relies on the New York Constitution, because that claim is duplicative of the federal claim. *Hawthorne v. County of Putnam,* 492 F. Supp. 3d 281, 304-05 (S.D.N.Y. 2020) ("District courts in this circuit have consistently held that there is no private right of action under the New York State Constitution where, as here, remedies are available under [Section] 1983.") (cleaned up). These conclusions are more fully explained below.

### 1. Plaintiff's Procedural Due Process Claim

"To state a claim under Section 1983, a plaintiff must allege (1) 'the challenged conduct was attributable to a person who was acting under color of state law,' and (2) 'the conduct deprived the plaintiff of a right guaranteed by the U.S. Constitution.' " *Paul v. Capra,* No. 20 Civ. 5154, 2022 WL 992845, at \*4 (S.D.N.Y. Mar. 31, 2022); *accord Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir. 2010). The first element is satisfied here, as "NYCERS is a New York City administrative agency, which qualifies as a 'person' acting 'under color' of state law." *Smalls,* 2019 WL 3716444, at \*3 n.2 (quoting *Campo v. NYCERS,* 843 F.2d 96, 99 (2d Cir. 1988)). "In a § 1983 suit brought to enforce procedural due process rights, a court must first determine whether a property interest is implicated, and then, if it is, determine what process is due before the plaintiff may be deprived of that interest." *Nnebe v. Daus,* 931 F.3d 66, 80 (2d Cir. 2019).

As discussed above, "[t]here is little question that plaintiff's right to continued pension payments is a property right protected by the due process clause of the Fourteenth Amendment." *Smalls,* 2019 WL 3716444, at \*4. The Complaint alleges that Plaintiff had a "legitimate claim of entitlement to" pension benefits, because the "regulations governing the distribution of benefits 'meaningfully channel official discretion by mandating a defined administrative outcome,' " notwithstanding some " 'judgment in applying' a standard" on Defendant's part. *Barrows v. Becerra,* 24 F.4th 116, 139 (2d Cir. 2022). Plaintiff "did not withdraw [his] pension contributions," and Defendant determined that he was "eligible to file for Disability Retirement provided that the agency grants [him] leave without pay." After HPD granted Plaintiff leave, Defendant deemed Plaintiff's 2008 Application "valid." Plaintiff had even been approved for benefits before, based on injuries incurred prior to the 2008 Application. Contrary to Defendant's argument, pension benefits are not merely "simple, state-law contractual rights" that are not "worthy of substantive due process protection." *Local 342, Long Island Pub. Serv. Empls., UMD, ILA, AFL-CIO v. Town Bd. of the Town of Huntington,* 31 F.3d 1191, 1196. Unlike most contract rights, the right to unimpaired pension benefits is protected by the New York Constitution. *See* N.Y. Const. art. V, § 7 ("[M]embership in any pension or retirement system of the state or of a civil division thereof shall be a contractual relationship, the benefits of which shall not be diminished or impaired."); *see Weaver v. NYCERS,* 717 F. Supp. 1039, 1043 (S.D.N.Y. 1989) (collecting cases).

To determine if Plaintiff received due process before being deprived of his property interest, "the court must engage in the familiar three-factor test first articulated in *Mathews v. Eldridge,*" and balance "(1) the private interest at stake; (2) the risk of an erroneous deprivation of that interest through the procedures used and the probable value (if any) of alternative procedures; [and] (3) the government's interest, including the possible burdens of alternative procedures." *Barrows,* 24 F.4th

Case 1:25-cv-00341-LEK-MJK    Document 3    Filed 03/28/25    Page 59 of 62

Teichmann v. New York City Employees' Retirement System, Not Reported in Fed....

at 140 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). Defendant's June 11, 2018, letter stated that "[t]he NYCERS Medical Board did not consider" the 2008 Application at all, even as the letter stated that Plaintiff's retroactive leave made the 2008 Application "valid." This followed numerous prior communications from Defendant stating that the 2008 Application "could not be processed." By refusing even to "consider" or "process[ ]" Plaintiff's application, Defendant afforded Plaintiff no process at all, and the availability of Article 78 proceedings does not cure that deficit.

**\*5** This is not a case where postdeprivation process can cure the lack of earlier process. "[I]n certain circumstances, the lack of such predeprivation process will not offend the constitutional guarantee of due process, provided there is sufficient postdeprivation process." *Catanzaro v. Weiden*, 188 F.3d 56, 61 (2d Cir. 1999); *accord Anderson v. Townsend*, No. 21 Civ. 3569, 2021 WL 5359681, at \*5 (S.D.N.Y. Nov. 17, 2021). In the procedural due process context, "the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996). For random, unauthorized acts, due process is satisfied "so long as the State provides a meaningful postdeprivation remedy." *Id.*; *accord Anderson*, 2021 WL 5359681, at \*5. On the other hand, "[w]hen the deprivation occurs in the more structured environment of established state procedures, rather than random acts, the availability of postdeprivation procedures will not, ipso facto, satisfy due process." *Hellenic Am. Neighborhood Action Comm.*, 101 F.3d at 880; *accord Salahuddin v. City of Mount Vernon*, No. 20 Civ. 7021, 2022 WL 564002, at \*3 (S.D.N.Y. Feb. 24, 2022); *see also Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 465-66 (2d Cir. 2006) (elaborating on "[t]he distinction between random and unauthorized conduct and established state procedures").

Defendant deprived Plaintiff of property pursuant to an established state procedure, so some pre-deprivation process was required. "An action is authorized where a state delegates to the defendants the power and authority to effect the very deprivation complained of, and also delegates to them the concomitant duty to initiate the procedural safeguards set up by state law to guard against unlawful deprivation." *Salahuddin*, 2022 WL 564002, at \*3; *accord Rivera-Powell*, 470 F.3d at 465. In general, acts of "ultimate decision-maker[s]" with "final authority over significant matters," are not "considered 'random and unauthorized' conduct for purposes of procedural due process analysis," even if "contrary to law." *Rivera-Powell*, 470 F.3d at 465-66 (collecting cases); *see Salahuddin*, 2022 WL 564002, at \*3. Defendant is tasked by the City with finally adjudicating pension applications and has a set of procedures for doing so. Consequently, predeprivation process was required.

While the availability of postdeprivation Article 78 proceedings may make up for a NYCERS process that "was not wholly adequate," the backstop of judicial remedies does not excuse a complete lack of predeprivation process. *See King v. NYCERS*, 595 F. App'x 10, 12 (2d Cir. 2014) (summary order) (collecting cases); *see Green v. Dept. of Educ. of City of New York*, 16 F.4th 1070, 1077 (2d Cir. 2021); *Rivera-Powell*, 470 F.3d at 467 (2d Cir. 2006) (pre-deprivation process "need not be elaborate" so long as it provides "notice and an opportunity to respond"). At least some pre-deprivation process is required in the analogous "context of termination or suspension of pension benefits." *Minima v. NYCERS*, No. 11 Civ. 2191, 2012 WL 4049822, at \*7 (E.D.N.Y. Aug. 17, 2012) (collecting cases); *accord Smalls*, 2019 WL 3716444, at \*5; *King v. NYCERS*, 212 F. Supp. 3d 371, 403 (E.D.N.Y. 2016). The cases in which Article 78 alone was sufficient to address a NYCERS pension issue are cases in which plaintiffs sought to change their own benefit elections, not any decision by NYCERS. *See, e.g.*, *Campo*, 843 F.2d 96 (finding Article 78 adequate where plaintiff contested deceased husband's selection of an option that did not include a survivor's benefit); *Bagedonow v. NYCERS*, No. 09 Civ. 9603, 2010 WL 2927436, at \*4 (S.D.N.Y. 2010) (finding Article 78 adequate where Plaintiff challenged his own plan selection after the fact). Defendant's refusal even to initiate the established procedures for adjudicating valid applications is inadequate predeprivation process under any standard.

### 2. Statute of Limitations

**\*6** Plaintiff's claim is not time barred by Section 1983's three-year statute of limitations because the Complaint sufficiently alleges that the claim accrued on June 11, 2018, and Plaintiff filed suit on June 7, 2021. *See Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013); *accord Lucente v. County of Suffolk*, 980 F.3d 284, 308 (2d Cir. 2020).

Case 1:25-cv-00341-LEK-MJK    Document 3    Filed 03/28/25    Page 60 of 62

Teichmann v. New York City Employees' Retirement System, Not Reported in Fed....

### a. Application of Section 1983's Statute of Limitations

The "statute of limitations is an affirmative defense for which [the defendant] bears the burden of proof." *Browe v. CTC Corp.*, 15 F.4th 175, 190 (2d Cir. 2021) (alteration in original). Dismissal is appropriate only if "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015) (internal quotation marks omitted).

The Complaint sufficiently alleges that Plaintiff's procedural due process claim accrued on June 11, 2018, the first time Defendant addressed and summarily rejected Plaintiff's concededly valid 2008 Application. Federal claims accrue when " 'the plaintiff knows or has reason to know of the injury which is the basis of his action,' that is, 'the allegedly impermissible conduct and the resulting harm.' " *DeSuze v. Ammon*, 990 F.3d 264, 270 (2d Cir. 2021); *see McDonough v. Smith*, 139 S. Ct. 2149, 2155 (2019); *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (cleaned up). A procedural due process violation "is not complete unless and until the State fails to provide due process." *Zinermon v. Burch*, 494 U.S. 113, 126 (1990); *accord Tammaro v. City of New York*, No. 13 Civ. 6190, 2018 WL 1621535, at *7 (S.D.N.Y. Mar. 30, 2018).

Contrary to Defendant's argument, the claim did not accrue on June 8, 2017, because at that time, Defendant addressed only the 2011 Application; Defendant's 2017 decision viewed the 2008 Application as untimely and stated only that an *untimely* prior application did not require retroactive benefits under the 2011 Application. The first time Plaintiff learned that Defendant would reject his 2008 Application without a hearing -- despite conceding its validity -- was June 11, 2018. *See Duncan v. Sullivan County*, No. 18 Civ. 9269, 2020 WL 1033064, at *5 (S.D.N.Y. Mar. 2, 2020) ("[T]he date of accrual is the time when a final determination is issued ... the time at which the litigant could have assumed that he or she had received a final determination"); *Urbina v. Port Auth. of N.Y.*, No. 15 Civ. 8647, 2017 WL 3600424, at *5 (S.D.N.Y. Aug. 18, 2017) (" '[P]rocedural due process claim accrues when a plaintiff is given final notice that she would not receive further process' or when plaintiff requests a hearing and is denied.").

### b. Collateral Estoppel

Collateral estoppel does not require a different result, because the statute of limitations issue in this action was not raised or decided in the Article 78 proceeding. Collateral estoppel "applies only where 'the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action.' " *Simmons v. Trans Express Inc.*, 170 N.E.3d 733, 737 (N.Y. 2021). The Article 78 court found only that Plaintiff's arbitrary-and-capricious challenge to Defendant's 2017 decision was untimely. The Article 78 proceeding did not address Defendant's refusal on June 11, 2018, even to adjudicate the 2008 Application. The state court characterized the 2018 letters as mere "request[s] for reconsideration" of the earlier decision that did not extend the four-month limitation period because they "did not constitute a fresh and complete examination based on newly presented evidence." *See Teichmann*, 111 N.Y.S.3d at 177. That state-law ruling does not preclude this Court's determination under federal law of when Plaintiff's due process claim accrued. *See McDonough*, 139 S. Ct. at 2155 (" '[T]he time at which a § 1983 claim accrues 'is a question of federal law.' ").

**\*7** Even if the Article 78 court had addressed this issue, collateral estoppel does not "bar relitigation of a pure question of law," such as "when a cause of action accrues for Statute of Limitations purposes." *Avon Dev. Enters. Corp. v. Samnick*, 730 N.Y.S.2d 295, 297 (1st Dep't 2001) (citing *Am. Home Assurance Co. v. Int'l Ins. Co.*, 684 N.E.2d 14, 16 (N.Y. 1997)); *accord CitiMortgage, Inc. v. Ramirez*, 136 N.Y.S.3d 572, 574 (3d Dep't 2020); *Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d Cir. 2021) ("The application of a statute of limitations presents a legal issue ...."). Collateral estoppel therefore does not preclude this action on statute of limitations grounds.

Case 1:25-cv-00341-LEK-MJK    Document 3    Filed 03/28/25    Page 61 of 62

Teichmann v. New York City Employees' Retirement System, Not Reported in Fed....

**c. Rooker-Feldman Doctrine**

Plaintiff's procedural due process claim is not barred by the *Rooker-Feldman* doctrine. "[F]our requirements ... must be met for *Rooker-Feldman* to apply: (1) 'the federal-court plaintiff must have lost in state court[;]' (2) 'the plaintiff must complain of injuries caused by a state-court judgment[;]' (3) 'the plaintiff must invite district court review and rejection of that judgment[;]' and (4) 'the state-court judgment must have been rendered before the district court proceedings commenced.' " *Dorce v. City of New York*, 2 F.4th 82, 101 (2d Cir. 2021). Although the first and fourth so-called "procedural" requirements are both plainly satisfied, neither of the two "substantive" requirements are met. Plaintiff's alleged injuries were not caused by the state court judgment, and Plaintiff's claim does not invite review or rejection of that judgment.

The requirement that the complained-of injury be "caused by a state-court judgment ... is the core requirement from which the other *Rooker-Feldman* requirements derive." *Id.* at 102. By definition, "a party is not complaining of an injury 'caused by' a state-court judgment when the exact injury of which the party complains in federal court existed prior in time to the state-court proceedings, and so could not have been 'caused by' those proceedings." *McKithen v. Brown*, 481 F.3d 89, 98 (2d Cir. 2007); *accord Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 988 F.3d 634, 641 (2d Cir. 2021). Plaintiff's procedural due process claim seeks relief for Defendant's denial of his pension benefits under his 2008 Application, which occurred at the latest on June 11, 2018, two months before Plaintiff filed his Article 78 challenge in August. *See, e.g. King*, 595 F. App'x at 11 ("King's action is not barred by Rooker–Feldman because he does not solely complain of injuries caused by a state court judgment. Rather, he complains of NYCERS's decision to deny him Tier I benefits. That decision predates his Article 78 proceeding, 'and so could not have been "caused by" those proceedings.' "). For *Rooker-Feldman* to apply, the acts that caused the complained-of injury must be "produced by a state court judgment and not simply ratified, acquiesced in, or left unpunished by it." *Dorce*, 2 F.4th at 104 (quoting *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 88 (2d Cir. 2005)).

Defendant's arguments are based on an outdated conception of the *Rooker-Feldman* doctrine that was abrogated by *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005). After *Exxon*, "applicability of the *Rooker-Feldman* doctrine turns not on the *similarity* between a party's state-court and federal-court claims ... but rather on the *causal relationship* between the state-court judgment and the injury of which the party complains in federal court." *McKithen*, 481 F.3d at 97-98; *Plymouth Venture*, 988 F.3d at 641. Current "doctrine does not 'stop a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court.' " *McKithen*, 481 F.3d at 98 (quoting *Exxon Mobil*, 544 U.S. at 293); *accord In re Lau*, No. 20 Civ. 1930, 2021 WL 796619, at *6 (S.D.N.Y. Feb. 26, 2021).

**\*8** Contrary to Defendant's argument, this action is not an "attempt to void" the state judgment merely because it seeks a different result. *See McKithen*, 471 F.3d at 98 ("A plaintiff who seeks in federal court a result opposed to the one he achieved in state does not, for that reason alone, run afoul of *Rooker-Feldman*."); *accord Reliability Inc. v. Doki*, No. 20 Civ. 7109, 2021 WL 3408589, at *8 (S.D.N.Y. Aug. 4, 2021). Nor is Plaintiff's claim "inextricably intertwined" with the state court judgment because it can "succeed[ ] only to the extent that the state court wrongly decided the issues before it" or is "predicated upon a determination that a state court ruling was incorrect." *See McKithen*, 481 F.3d at 97 n.7.

Defendant's assertion that Plaintiff is engaged in impermissible forum shopping is similarly without merit. The *Rooker-Feldman* doctrine prohibits appealing state court decisions to federal district courts, not forum shopping. *Exxon Mobil* specifically rejected the earlier conception of the doctrine that would go beyond the four-factor test described above to "override Congress' conferral of federal-court jurisdiction concurrent with jurisdiction exercised by state courts, and supersede the ordinary application of preclusion law under 28 U.S.C. § 1738." *Dorce*, 2 F.4th at 101 (quoting *Exxon Mobil*, 544 U.S. 280, 283 (2005)) (cleaned up).

**C. Breach of Contract**

Defendant argues that Plaintiff's breach of contract claim is barred by the *Rooker-Feldman* doctrine and collateral estoppel. These arguments are unavailing for the reasons discussed above. Defendant also argues that the Court should not retain

Case 1:25-cv-00341-LEK-MJK    Document 3    Filed 03/28/25    Page 62 of 62

Teichmann v. New York City Employees' Retirement System, Not Reported in Fed....

supplemental jurisdiction if all federal claims are dismissed. This argument fails because the procedural due process claim survives. Defendant's motion to dismiss the breach of contract claim is denied.

#### D. Intentional Infliction of Emotional Distress

Plaintiff's claim for intentional infliction of emotional distress is dismissed for lack of jurisdiction, because the Complaint does not allege that Plaintiff timely served a notice of claim. New York law requires Plaintiff to serve on New York City a "notice of claim" before filing any tort claim against "the city or any agency." N.Y. Gen. Mun. Law § 50-k(6); *see DeSimone v. NYCERS*, 876 N.Y.S.2d 467, 468 (2d Dep't 2009) ("[NYCERS] is an administrative agency of the City of New York ...."). Notice must be served "within ninety days after the claim arises." § 50-e(1)(a). "While 'New York's notice of claim requirements are not applicable to section 1983 claims brought in federal court ... the requirements do apply to state law personal injury claims that are brought in federal court as related to section 1983 cases.' " *McTerrell v. N.Y.C. Health & Hosp. Corp.*, No. 19 Civ. 4469, 2020 WL 1503194, at *4 (S.D.N.Y. Mar. 30, 2020).

Even if Plaintiff's notice of claim were substantively adequate, the Complaint does not allege, as it must, that it was timely filed. *See* § 50-i(1) (requiring "an allegation in the complaint ... that at least thirty days have elapsed since the service of such notice," i.e., "a notice of claim ... in compliance with" the requirements of § 50-e, including the time limits); *accord Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999); *Columna v. City of New York*, No. 19 Civ. 3801, 2022 WL 767103, at *6 (S.D.N.Y. 2022). The Complaint alleges that a filing was made with the Office of the Comptroller but not the date of filing. Defendant's motion attaches two filings titled "Notice of Claim" dated February 8, 2019, but the Complaint does not allege any adverse action by Defendant after June 11, 2018, or that Plaintiff sought to "extend the time to serve a notice of claim." § 50-e(5). Because the notice of claim was filed more than 90 days after the latest date on which Plaintiff's tort claims could have arisen, this Court lacks jurisdiction over Plaintiff's state law tort claim. *See Morales v. City of New York*, No. 14 Civ. 7253, 2016 WL 9651130, at *6 (S.D.N.Y. Aug. 9, 2016) ("[F]ederal courts do not have jurisdiction to hear state law claims brought by plaintiffs who have failed to comply with the notice of claim requirement, nor can a federal court grant a plaintiff permission to file a late notice of claim.").

#### IV. CONCLUSION

**\*9** For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. The following claims are dismissed: due process claims that rely on the New York Constitution, the section 1983 claim to the extent it relies on alleged violations of substantive due process and the intentional infliction of emotional distress claim. Defendant's motion is denied as to the following claims, which survive: the breach of contract claim and the section 1983 claim to the extent it relies on alleged violations of procedural due process.

The Clerk of Court is respectfully directed to close the motion at Docket Number 20.

#### All Citations

Not Reported in Fed. Supp., 2022 WL 4237110

---

    © 2025 Thomson Reuters. No claim to original U.S. Government Works.